

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-12-00554-CV

**SPRINGER RANCH, LTD.**,
Appellant,

v.

O.F. **JONES** III, Margaret Matthews, Ethel Matthews Rust, Ethel Matthews Rust as the
Guardian/Trustee for Elizabeth Matthews, and Rosalie Matthews Sullivan,
Appellees

From the 81st Judicial District Court, La Salle County, Texas
Trial Court No. 11-08-00129-CVL
Honorable Stella Saxon, Judge Presiding

Opinion by:    Luz Elena D. Chapa, Justice

Sitting:    Karen Angelini, Justice
            Patricia O. Alvarez, Justice
            Luz Elena D. Chapa, Justice

Delivered and Filed:  December 20, 2013

AFFIRMED

In this appeal from a declaratory judgment, we must construe a 1993 contract to determine

the allocation of royalties from a horizontal well that begins on the property of the appellant,

Springer Ranch, Ltd., but ends under the property of Rosalie Matthews Sullivan, one of the

appellees. Our construction will also govern the allocation of royalties to future horizontal wells

covered by the contract. The trial court held the contract required royalties from the horizontal

well in dispute, and any future horizontal wells crossing the parties' property lines, must be

allocated based on the productive portions of the well underlying the parties' properties. We affirm.

## BACKGROUND

*Origin of the Parties' Interests*

The parties to this appeal are the heirs or successors-in-interest to Alice Burkholder, who owned 8,545 acres of land in La Salle County, Texas, and Webb County, Texas. The property is centered around Encinal, Texas. Alice executed an oil and gas lease on the entire property in 1956 that is still in force today. Upon her death, Alice's will devised her property interest as a life estate in her husband, Joseph Burkholder. The will divided the remainder interest into three tracts and devised the tracts to the parties' predecessors-in-interest. Joseph passed away in 1990, and the land was divided in accordance with the will. Springer Ranch, successor-in-interest to Barbara Welhausen Springer, holds the portion of the original Burkholder tract "lying North of the Krugerville Road and West of Highway 81 [now U.S. Interstate 35]." Rosalie Matthews Sullivan, successor-in-interest to Lawrence Matthews, holds the "land lying on the East side of Highway 81 [I-35]." The "land lying South of the Krugerville Road and West of Highway 81" is held by some combination of O.F. Jones III, Margaret Matthews, Ethel Matthews Rust, and Elizabeth Matthews, as successors-in-interest to Anthony Matthews. Springer Ranch and Sullivan own the entire undivided interests in their tracts of land and the lease benefits from their tracts. O.F. Jones and the remaining Matthews parties have entered into a partition agreement with respect to the third tract.

In 1993, the parties to this appeal or their predecessors-in-interest executed the contract at issue in this case. The contract recites in part:

> WHEREAS, a question has arisen as to the ownership of royalties payable under the [Burkholder] lease to the owners of the various tracts of land above described; and

WHEREAS, the parties wish to settle such question by means of this instrument;

The operative language of the agreement provides:

[the parties] contract and agree with each of the other parties, that all royalties payable under the above described Oil and Gas Lease from any well or wells on said 8,545.02 acre tract, shall be paid to the owner of the surface estate on which such well or wells are situated, without reference to any production unit on which such well or wells are located . . . .

This agreement affected six vertical wells at the time it was made with two wells situated on each subdivided tract.

*Present Controversy*

This 1993 contract operated for almost two decades prior to the drilling of the first horizontal well under the Burkholder lease. This well, the Springer Ranch No. 2 well ("the SR2 well"), begins on Springer Ranch's property, crosses the boundary line between Springer Ranch's property and Rosalie Matthews Sullivan's property, and terminates under Sullivan's property. When Sullivan became aware of the nature of the SR2 well, she negotiated with Springer Ranch to receive a portion of the royalties from that well. After those negotiations failed, she made a demand for a portion of the royalties to the well's operator. The operator ceased paying royalties until the dispute was resolved between Springer Ranch and Sullivan. We have reproduced the following image from the record to illustrate the situation of the SR2 well.



With respect to the SR2 well, Springer Ranch is in the position of "Surface Owner A," and Sullivan is in the position of "Surface Owner B." The illustration does not purport to be to scale.

Springer Ranch then sued Sullivan and the other parties in a declaratory judgment action. It moved for summary judgment, seeking a declaration that it was entitled to receive all the royalties from the SR2 well under the 1993 contract, and that the same allocation applied to future horizontal wells covered by the contract. Its proposed construction at trial and on appeal is succinctly stated in its brief:

> The words in the Royalty Agreement work in harmony to establish a very simple mechanism by which the parties' 1992–93 controversy was settled. "All" royalties, meaning 100% without division, were to be paid to "the" owner, meaning a single exclusive owner, who owned the "the surface estate on which such well [is] situated," meaning the visible location on the land from which hydrocarbons exited, "without reference to any production unit on which such well or wells are located," meaning without any regard to the acreage that "can reasonably be considered to be productive

of hydrocarbons." That is what is required by the plain meaning of the words. That construction employs and harmonizes all the words used.

The defendants (collectively referred to as "the Matthews") filed a competing motion for summary judgment, asking the trial court to allocate the royalties to the SR2 well between Springer Ranch and Sullivan based on the location of the productive portions of the well. Their argument rests on the premise that the SR2 well is "situated on" both Springer Ranch's and Sullivan's "surface estates" within the meaning of the 1993 contract. Thus, Springer Ranch and Sullivan are entitled to "all" the royalties from the "productive portions" of the SR2 well "situated" on their "surface estates." As part of their summary judgment evidence, the Matthews offered the affidavit of a petroleum engineer to show how "all" the royalties from the portions of the well "situated on" the respective "surface estates" could be determined and allocated. They also sought a declaration that the same formula be applied to future horizontal wells.

The trial court held a hearing on the parties' motions. After the hearing, the court issued this judgment:

> (i) the June 3, 1993 agreement referred to by the parties as the Royalty Agreement, concerning ownership of royalties under the October 5, 1956 oil and gas lease recorded in Volume 5, Page 151 of the Oil and Gas Records of La Salle County, Texas, is unambiguous; (ii) the Royalty Agreement requires that the royalties from the Springer Ranch No. 2 well be divided between Defendant Rosalie Sullivan and Plaintiff Springer Ranch Ltd. based on the productive portions of the well situated on their properties; (iii) Defendant Rosalie Sullivan is entitled to receive royalty of .08500689 of production from the well and Plaintiff Springer Ranch, Ltd. is entitled to receive royalty of .03999311 of production from the well; (iv) royalties from any future horizontal wells that are subject to the Royalty Agreement and that are situated on more than one tract of land and owned by any of the parties to this suit or their heirs, successors, and assigns will be allocated in proportion to the producing portions of the well situated on each of the respective tracts.

Springer Ranch appeals from this judgment.

**STANDARD OF REVIEW**

"We review the trial court's summary judgment de novo." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). "When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Id.* "When both parties move for partial summary judgment on the same issues and the trial court grants one motion and denies the other, as here, the reviewing court considers the summary judgment evidence presented by both sides, determines all questions presented, and if the reviewing court determines that the trial court erred, renders the judgment the trial court should have rendered." *Id.*

**CONTRACT INTERPRETATION**

"If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law." *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983). In construing an unambiguous contract, our primary concern is to ascertain the true intentions of the parties as expressed in the agreement. *Valence Operating*, 164 S.W.3d at 662. The parties' intentions should be understood in light of the facts and circumstances surrounding the contract's execution so long as those circumstances inform, rather than vary from or contradict, the contract's text. *Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 & n.25 (Tex. 2011) (citing *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981)). It is the parties' objective intent, as expressed in the document, not their subjective intent, which may not have been expressed, that controls our construction of the contract. *Matagorda Hosp. Dist. v. Burwell*, 189 S.W.3d 738, 740 (Tex. 2006) (per curiam). To ascertain the parties' objective intent, we "should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Valence Operating*, 164 S.W.3d at 662. We

give the contract's terms their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense. *Id.*

We also "construe contracts 'from a utilitarian standpoint bearing in mind the particular business activity sought to be served' and 'will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive.'" *Frost Nat'l Bank v. L&F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)). However, "'parties make their own contracts, and it is not within the province of this court to vary their terms in order to protect them from the consequences of their own oversights and failures . . . .'" *Provident Fire Ins. Co. v. Ashy*, 162 S.W.2d 684, 687 (Tex. 1942) (quoting *Dorroh-Kelly Mercantile Co. v. Orient Ins. Co.*, 135 S.W. 1165, 1167 (Tex. 1911)); *see also Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996) ("We have long held that courts will not rewrite agreements to insert provisions parties could have included or to imply restraints for which they have not bargained."). Therefore, "[t]he intent of a contract is not changed simply because the circumstances do not precisely match the scenarios anticipated by the contract." *SAS Inst., Inc. v. Breitenfeld*, 167 S.W.3d 840, 841 (Tex. 2005).

### DISCUSSION

*The Surrounding Circumstances*

The impetus for the 1993 contract was the division of the original Burkholder property—and thus the benefits of the outstanding mineral lease over the property—at Joseph Burkholder's death. During the time between the lease's execution in 1956 and Joseph's death, the original lessee-operator carved out portions of its mineral interest under the Burkholder lease and assigned those interests to other operators, who in turn subdivided and assigned their interests to other operators. When the parties' remainder interests became present interests in 1990, it became apparent that the property boundary lines of their interests, as established by Alice's will, did not

match with and were crossed by the boundary lines separating the operators who held portions of the lessee's interest under the Burkholder lease.

Once the mismatch became apparent, one of the operators stopped paying royalties and would not resume royalty payments until the parties executed division orders.[1] The parties did execute division orders. However, one of the parties questioned the division orders after discovering that a well situated on an adjoining party's property was located within a "production unit," almost half of which included acreage from his property.[2] The operator again suspended royalty payments until the 1993 agreement was reached.

In 1993, each of the three sets of parties had two vertical wells on their "surface estates," whose "production units" included acreage from an adjoining party's property. Therefore, the parties agreed each party would receive all the royalties from the wells "situated on" their "surface estate" and would forego any claims to the royalties from wells on the adjoining parties' surface estates. Bearing in mind the surrounding circumstances, we turn to the contract's text.

*"all royalties payable under the above described Oil and Gas Lease from any well or wells on said 8,545.02 acre tract, shall be paid to the owner of the surface estate on which such well or wells are situated . . . ."*

- **"well"**

Because the contract allocates the royalties payable from wells based on where the wells are situated, we begin by construing the term "well." The Matthews parties argue that "well"

---

[1] Division orders executed by royalty owners govern the distribution of oil and gas proceeds, directing to whom such proceeds will be paid and in what proportion. *Condra v. Quinoco Petroleum, Inc.*, 954 S.W.2d 68, 70 (Tex. App.—San Antonio 1997, pet. denied). They protect purchasers and operators in cases where they "pay out the correct total of proceeds owed, but err in the distribution, overpaying some royalty owners and underpaying others." *Gavenda v. Strata Energy, Inc.*, 705 S.W.2d 690, 692 (Tex. 1986). But they are only binding until revoked. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 123 (Tex. 1996).

[2] The term "production unit" does not appear to carry any specialized oil and gas meaning. Springer Ranch argues that "production unit" is synonymous with "proration unit." In a separate reply brief, Jones argues that "production unit" referred to pooling units created by the various owners of the lessee's interest.

should be understood as "the entire underground orifice from which oil and gas are produced." Springer Ranch does not discuss or advocate for a particular definition of "well," but its construction requires "well" to be only the topmost portion of the hole on the surface where hydrocarbons exit the earth or the structure overlying the well.[3]

Legal and lay authorities agree that "[a] well is a shaft or hole bored or sunk in the earth through which the presence of minerals may be detected and their production obtained." *Kothmann v. Boley*, 308 S.W.2d 1, 3 (Tex. 1957); *accord* BLACK'S LAW DICTIONARY 1732 (9th ed. 2009) (defining "well" as "a hole or shaft sunk into the earth to obtain a fluid, such as water, oil, or natural gas"); SHORTER OXFORD ENGLISH DICTIONARY 3604, at 5, 5 spec. (b) (6th ed. 2007) (defining "well" as "any shaft or pit sunk or dug into the ground . . . a shaft sunk in the ground to reach and tap a supply of oil, brine, gas, etc."); MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1342, at 2b (10th ed. 1999) (defining "well" as "a shaft or hole sunk to obtain oil, brine, or gas"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2594, at 4c (2002) (defining "well" as "a shaft or pit dug or bored in the earth . . . a shaft or hole sunk to obtain oil, brine, or gas"). The Matthews' summary judgment evidence also included the affidavit of a petroleum engineer, who stated "[w]hile the surface location of the wellhead is on Springer Ranch property, the well is situated on both Ms. Sullivan's and Springer Ranch property."

The Matthews' expert's affidavit suggests, and we agree, that Springer Ranch's construction requires "well" to be conflated with the term "wellhead," which is the top of the hole from which hydrocarbons exit, or the visible structure over the well. *See* SHORTER OXFORD ENGLISH DICTIONARY 3606, at 2 b (defining "wellhead" as "[a] structure erected over an oil well or gas well"); MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1342, at 3 (defining "wellhead" as

---

[3] At oral argument, Springer Ranch conceded the normal meaning of "well" included the entire whole in ground.

"the top of or a structure built over a well"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2595, at 3 a, b (defining "wellhead" as "the top of a well . . . a structure built over the top of a well."). In its brief, Springer Ranch states "[t]here is no other surface location for the well other than the wellhead located on Springer Ranch's property." However, Springer Ranch does not cite any support for their necessarily limited definition of "well" or its conflation of "well" and "wellhead." Although we are aware "well" may be colloquially used in this way, we decline to construe the word in a way that contravenes its technical, legal, and dictionary definitions.

- **"on"**

Springer Ranch contends that, because the contract describes a well "on" a surface estate, it must mean only that part of the well that is visible on the surface of its property. It is true that "on" is often used to mean in contact with the top surface of a thing. SHORTER OXFORD ENGLISH DICTIONARY 2000, at 1, 2; MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 811, at 1 a, b; WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1574, at 1 a, c. But "on" is a versatile preposition and also denotes other spatial relations, including within the limits or bounds of something. SHORTER OXFORD ENGLISH DICTIONARY 2000, at 5; MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 811, at 2 c; WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1574, at 1 c. For instance, oil is said to be "on" one's property. *See, e.g., Fleming v. Ashcroft*, 175 S.W.2d 401, 404 (Tex. 1943) ("[O]n account of discovery of oil on the tract . . . ."). "On" is sometimes used in this sense with "well." *See, e.g., BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 63 (Tex. 2011) (referring to "good-faith efforts to develop a well on the Marshall lease . . . ."). Both parties argue that their definition of "on" is the only one consistent with the other uses of "on" in the contract's operative language: "from any well or wells *on* said 8,545.02 acre tract" and "without reference to any production unit *on* which such well or wells are located." Because "on" is so versatile, that argument is not persuasive for either party's construction.

- **"surface estate"**

We next examine the meaning of the term "surface estate." The "surface estate," strictly construed, is not "land" or any other kind of physical or corporeal structure on which a well may be situated. Instead, it is a "legal unit of ownership in the physical land." *Averyt v. Grande, Inc.*, 717 S.W.2d 891, 894 (Tex. 1986) ("'Land' is the physical earth in its natural state, while an estate in land is a legal unit of ownership in the physical land."). But it is fair, when construing a writing, to equate the "surface estate" with the physical or corporeal structures of the earth over which the surface estate owner has dominion, or owns. *See, e.g, Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 630 F.3d 431, 442 (5th Cir. 2011) (citing *Averyt*, 717 S.W.2d at 894). In this case, such a construction is necessary if the 1993 contract is to be given meaning under either party's construction. Separate surface and mineral estates do not come into existence until there is a grant of the minerals in a deed or lease, or a reservation in a conveyance. *See Moser v. U.S. Steel Corp.*, 676 S.W.2d 99, 101 (Tex. 1984). Therefore, in order to give meaning to the phrase "surface estate on which such well or wells are situated," we construe the term "surface estate" to mean the portions of the earth, over which the surface estate owner holds dominion after a severance of the mineral estate. *See Dunn-McCampbell*, 630 F.3d at 442; *Averyt*, 717 S.W.2d at 894; *Moser*, 676 S.W.2d at 101; BLACK'S LAW DICTIONARY 1580 (defining "surface interest" as "every right in real property other than the mineral interest").

To understand what mineral and surface estate owners actually own, we must discuss the relationship between hydrocarbons and the earth surrounding them.[4] *See generally* 2 ERNEST E.

---

[4] The mineral estate may include more than simply the ownership of hydrocarbons, if there was a general grant or reservation of minerals. *Moser*, 676 S.W.2d at 101–02 ("We now hold a severance of minerals in an oil, gas and other minerals clause includes all substances within the ordinary and natural meaning of that word, whether their presence or value is known at the time of severance."). The original Burkholder lease contains a general grant. However, the parties' 1993 contract in this case clearly pertains only to hydrocarbons—which are produced from *wells*.

SMITH & JACQUELINE LANG WEAVER, TEXAS LAW OF OIL AND GAS § 8.2[A]–[C], at 8-16.8 – 8-22 (LexisNexis Matthew Bender, 2nd ed. 2013); 1 W. L. SUMMERS, THE LAW OF OIL AND GAS § 4, at 4–17 (West 1954). Hydrocarbons reside within porous formations or reservoirs of rock under immense pressure from the overlaying earth. 2 SMITH & WEAVER, TEXAS LAW OF OIL AND GAS § 8.2[A], at 8-16.8; 1 SUMMERS, THE LAW OF OIL AND GAS § 4, at 10. When the porous reservoir is pierced by a well, the pressure of the impermeable earth above the reservoir and internal forces from within the reservoir, such as water trapped with the hydrocarbons, push the hydrocarbons out of the formation and into the well. 2 SMITH & WEAVER, TEXAS LAW OF OIL AND GAS § 8.2[A]–[C], at 8-16.8 – 8-22; 1 SUMMERS, THE LAW OF OIL AND GAS § 4, at 15.

With that understanding in mind, we note ownership of the hydrocarbons does not give the mineral owner ownership of the earth surrounding those substances. *Emeny v. United States*, 412 F.2d 1319, 1323 (Ct. Cl. 1969) (per curiam). In *Emeny*, the defendant mineral lessee was obtaining production from a gas formation. 412 F.2d at 1321. The defendant injected helium gas into the reservoir, which it had brought in from outside sources, and also injected helium gas from other producers who paid the defendant to store it in the reservoir. *Id.* at 1321–23. The injection of helium gas was unnecessary to the production of the hydrocarbon gas.[5] *Id.* at 1324. The court held that the right to use a gas reservoir for the storage of helium-gas mixtures and pure helium gas produced elsewhere was vested in the surface estate owners and not in the defendant mineral owner. *Id.* at 1320. The court explained "[t]he surface of the leased lands and everything in such lands, except the oil and gas deposits covered by the leases, were still the property of the respective landowners." *Id.* at 1323. "This included the geological structures beneath the surface, including

---

[5] If it had been necessary for recovery, the mineral owner likely would have had the authority to inject the gas because "[t]he mineral owner, as owner of the dominant estate, has the right to make any use of the surface which is necessarily and reasonably incident to the removal of the minerals." *Moser*, 676 S.W.2d at 103.

any such structure that might be suitable for the underground storage of 'foreign' or 'extraneous' gas produced elsewhere." *Id.* That holding has been cited with approval by the Texas Supreme Court. *Humble Oil & Refining Co. v. West*, 508 S.W.2d 812, 815 (Tex. 1974).

*Emeny*'s holding also accords with the nature of the mineral estate. *See Coastal Oil & Gas Corp. v. Garza Energy Trust*, 268 S.W.3d 1, 15 (Tex. 2008); *Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 630 F.3d 431, 441–42 (5th Cir. 2011). As the Texas Supreme Court has explained:

> While a mineral rights owner has a real interest in oil and gas in place, this right does not extend to *specific* oil and gas beneath the property; ownership must be considered in connection with the law of capture, which is recognized as a property right as well. The minerals owner is entitled, not to the molecules actually residing below the surface, but to a fair chance to recover the oil and gas in or under his land, or their equivalents in kind.

*Coastal Oil*, 268 S.W.3d at 15 (internal quotation marks and citations omitted). Relying on *Coastal Oil*, the Fifth Circuit has determined that "Texas law establishes that the holder of a mineral estate has the right to exploit minerals, but does not own the subsurface mass." *Dunn-McCampbell*, 630 F.3d at 442; *see also id.* at 441 ("[T]he conveyance of mineral rights ownership does not convey the entirety of the subsurface.").

Springer Ranch argues that relying on cases dealing with the disputes between the rights or boundaries of the surface and mineral estate owners (e.g., *Emeny* and *Dunn-McCampbell*) is improper because "[n]one of these cases concern the parties' identification, among competing 'mineral estate' owners, for the purpose of the payment of royalties for the actual production of oil and gas from the subsurface." We fail to see why the meaning of "surface estate" should vary from one context to another. Springer Ranch also argues that treating the well as situated on the surface estate conflates surface estate and mineral estate. We note that the physical structures and subsurface substances that the surface estate and mineral estate owners possess are inherently

- 13 -

intertwined, at least with respect to hydrocarbons. *See* SMITH & WEAVER, TEXAS LAW OF OIL AND GAS § 8.2[A]–[C], at 8-16.8 – 8-22; 1 SUMMERS, THE LAW OF OIL AND GAS § 4, at 4–17. Some conflation is unavoidable. However, if there are no minerals beneath the surface, the mineral estate owner owns the legal fiction of an estate that is nothing. *Dunn-McCampbell*, 630 F.3d at 441.

In light of the contract's language, physical facts of the mineral and surface estates, and the applicable case law, we conclude that the SR2 well—"the shaft or hole bored or sunk in the earth through which the presence of minerals may be detected and their production obtained"—is situated "on" more than one "surface estate," consistent with the Matthews' construction. Royalties from the well therefore should be allocated between Springer Ranch and Sullivan.

*"without reference to any production unit on which such well or wells are located"*

The contract explicitly bars the payment of royalties on the basis that the SR2 well's "production unit" includes acreage from both Springer Ranch's and Sullivan's properties. Springer Ranch complains that the trial court violated this provision by allocating royalties "based on the productive portions of the well situated on [the parties'] properties," arguing that the 1993 contract bars any division or allocation of the royalties between adjacent parties of the subdivided Burkholder tract. We disagree.

As noted above, the parties have offered competing interpretations of "production unit," which is not a term that carries any standardized oil and gas meaning. Without choosing to apply one definition over the other, we note that this provision is at the heart of the 1993 contract in light of the surrounding circumstances. The contract was made because one of the parties questioned whether he should receive royalties from a well that, although it was on an adjacent party's property, was located in a production unit which included much of its acreage from his property.[6]

---

[6] Whether that was a valid legal basis for apportioning royalties is not a question before us.

The contract's recitals and the surrounding circumstances confirm that this dispute and the desire to promptly resume royalty payments was the impetus for the 1993 contract. The objective meaning of this provision was to remove a well's location in a production unit that included acreage from adjoining parties as a basis for one party demanding a portion of the royalties from the well. Therefore, the parties agreed to allocate royalties on the basis of a well's situation on a party's property and not on the basis of a well's location in a production unit comprised of adjoining parties' acreage.

We find it unnecessary to discuss the virtues of the parties' competing definitions of the term "production unit" because it is clear that the court's judgment does not allocate royalties based on the fact that the SR2 well's "production unit" includes acreage from both Springer Ranch's and Sullivan's properties.[7] That would have been prohibited under the 1993 contract. But the allocation of royalties on the basis that a well is situated on two surface estates does not contravene this provision and does carry out the intent of the earlier provision.

*The Division and Allocation Formula*

Springer Ranch argues that if a well may be situated on more than one surface estate, the allocation of royalties based only on the "productive portions" of the SR2 well is incorrect, and that royalties should be allocated on the basis of the entire length of the well "on" the parties' property and not just the productive portions. We disagree, and conclude the trial court's allocation was a necessary consequence of the contract's language and was supported by the evidence before it.

---

[7] Initially, the trial court forwarded a letter to the parties informing them of its summary judgment ruling. The letter stated "[t]he unambiguous meaning of the Agreement that 'royalties shall be paid to the owner of the surface estate on which the well is situated' is that the horizontal well in question is situated on both Sullivan and Springer Ranch's properties."

The contract allocates "all royalties payable under the above described Oil and Gas Lease from any well or wells . . . ." A royalty is a fraction of the SR2 well's production, free of the costs of production, paid to the mineral lessor. *See Heritage Res.*, 939 S.W.2d at 121–22. Production from a well, whether horizontal or vertical, is not obtained from the entire length of the well, but from the part of the well that pierces and drains the reservoir in which the hydrocarbons reside. *See* 2 SMITH & WEAVER, TEXAS LAW OF OIL AND GAS § 8.2[A]–[C], at 8-16.8 – 8-22; 1 SUMMERS, THE LAW OF OIL AND GAS § 4, at 15. A vertical well may produce hydrocarbons from different formations within its vertical line. *See* 16 TEX. ADMIN. CODE § 3.10 (2013) (Tex. R.R. Comm'n, Restriction of Production of Oil and Gas from Different Strata). A horizontal well only produces hydrocarbons from the part of the well that lies within the hydrocarbon-bearing reservoir, or "correlative interval." *See* 16 TEX. ADMIN. CODE § 3.86(a)(1) (2013) (Tex. R.R. Comm'n, Horizontal Drainhole Wells). Along the horizontal displacement are takepoints through which hydrocarbons flow into the well. *See Browning Oil Co. v. Luecke*, 38 S.W.3d 625, 634–35 (Tex. App.—Austin 2000, pet. denied). A royalty, as a fraction of production, is only obtainable from the part of the SR2 well actually within the correlative interval. Despite Springer Ranch's argument that the calculation should be based on the whole length of the well, it is not the whole length of the well from which production is obtained. *See id.*

The Matthews' expert measured the total distance between the SR2 well's first and last takepoints within the correlative interval, the distance between its first takepoint and the property line between Sullivan and Springer Ranch's properties, and the distance between the property line and the well's last takepoint. The expert multiplied the one-eighth royalty provided under the 1956 lease by the ratio of the total distance between the first and last takepoints to allocate the royalties. He calculated: "[i]f the royalty were divided based on the length of open drainhole situated on each respective tract, Ms. Sullivan's net revenue interest in the well based on the one-eighth lease

royalty would be 0.08500689 (2,615.9/3,846.6 x 1/8) and Springer Ranch's share would be 0.03999311 (1,230.7/3,846.6x 1/8)." Springer Ranch did not dispute the expert's measurements or calculations, nor did it offer evidence of any other basis for determining how much production was obtained from the parts of the well on the parties' respective surface estates. Therefore, there is summary judgment evidence supporting the trial court's judgment allocating "all royalties" payable from the SR2 well based on the "productive portions of the well situated on [Springer Ranch's and Sullivan's] properties."[8]

*Our Construction*

Having reviewed the contract's terms, we agree with the Matthews' construction as it is the only plausible construction. Their construction of the word "well" to mean the entire length of the underground hole or shaft, comports with the legal, technical, and dictionary meaning of the term. *See Valence Operating*, 164 S.W.3d at 662 (We give the contract's terms "their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense."). We see no basis in light of the surrounding circumstance or the text of the contract to limit the term or conflate it with "wellhead." The SR2 well is situated on two "surface estates." *See Emeny*, 412 F.2d at 1323; *Dunn-McCampbell*, 630 F.3d 431, 441–42 (citing *Coastal Oil*, 268 S.W.3d at 15). Therefore, the royalties must be allocated on the basis that the productive portions of the SR2 well are situated on both Springer Ranch's and Sullivan's properties. But no royalties may be allocated on the basis that the production unit within which the SR2 well  is located includes acreage from both Springer Ranch's and Sullivan's properties.

---

[8] Springer Ranch argues that "producing portions of the surface estate" is nonsensical because the surface estate owner has no rights to minerals. That is true, but the question is not what rights do surface estate owners have to the minerals under their land but rather what "surface estate" means in the context of a contract that allocates royalties on the basis of a well's physical situation.

Springer Ranch argues the parties' past practice and history support its construction and point to evidence showing the royalties from previous wells located in production units with acreage from adjacent parties were allocated only to one party. *See Trinity Universal Ins. Co. v. Ponsford Bros.*, 423 S.W.2d 571, 575 (Tex. 1968). We disagree. Springer Ranch's argument presupposes that its construction was the correct one, but both Springer Ranch's and the Matthews' constructions were consistent with the past twenty years of vertical well drilling. In addition, we have explained that the Matthews' construction does not allocate royalties on the basis of combined production unit acreage.

Springer Ranch also argues that the Matthews' construction improperly incorporates horizontal well concepts that were not contemplated at the time the parties entered into the 1993 contract and that the failure of the parties to anticipate a change in technology does not justify rewriting the contract in favor of the Matthews. *See Marcus Cable Assocs. v. Krohn*, 90 S.W.3d 697, 703–06 (Tex. 2002) (holding contractual easement for "electric transmission or distribution line or system" could not be construed in light of technological advances to permit installation of cable television lines). We have not altered the meanings of "well," "on," "surface estate," "production unit," or "royalties" to accommodate a change in technology. *Cf. id.* The intent of the parties was to allocate royalties from "wells" without respect to "production units," regardless of whether the parties contemplated the differences between vertical and horizontal wells. *Cf. Browning Oil*, 38 S.W.3d at 640 ("The intent of the parties was to authorize pooling, but to prevent the dilution of the Lueckes' royalties, whether the royalties represented production from vertical wells or horizontal wells."). We have integrated horizontal-well concepts into our construction of the word "royalties" because, unlike a vertical well, the SR2 well crosses the surface estate of more than one party and obtains royalties from takepoints along its entire length within the correlative interval. *Cf. id.* at 642–46 (holding jury charge on damages was erroneous because the remedy for

breach of anti-dilution provisions must be based on the facts of horizontal-well drilling). We find Springer Ranch's complaint unpersuasive.

Another rule of contract construction supports our holding. The Texas Supreme Court has stated that a court should construe contracts "'from a utilitarian standpoint bearing in mind the particular business activity sought to be served'" and "'avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive.'" *Frost Nat. Bank*, 165 S.W.3d at 312 (quoting *Reilly*, 727 S.W.2d at 530). In *Frost*, the Court held the court of appeals's construction of an equipment-lease agreement with a purchase option provision violated those precepts. *Id.* at 311. The lessee had attempted to exercise the purchase option and buy the equipment a little over a year into the five-year lease term, but the lessor refused, contending that the contract only allowed the lessee to purchase the equipment when the lease term ended. *Id.* The court of appeals construed the lease to allow the lessee to exercise its purchase right when it terminated the lease little more than a year after it began. *Id.* at 312.

The Court reversed and held the court of appeals committed two errors by construing the lease to permit the lessee to exercise the purchase option when it terminated the lease early. *Id.* at 312–13. First, the court of appeals committed error by interchanging the words terminate and expire, which were two distinct ways the lease could have ended. *Id.* at 313. The Court also held that

> In addition, L & F's and the court of appeals' construction is unreasonable, inequitable, and oppressive. Such a construction allows the lessee to terminate the lease and purchase the vehicles for the same price (twenty percent of the original invoice price) at any point during the five-year lease term with the requisite notice. At the lessee's discretion, then, the lessor would essentially have to forgo almost the entire rental value of the equipment and sell it almost new for twenty percent of its value, the same price it would receive for selling the equipment at the end of the lease term after collecting rent on it for sixty months. Bearing in mind that our primary goal is to ascertain the intent of the parties when they entered into the

> agreement, we find such a construction unreasonable. Because there is only one reasonable interpretation of the lease, we construe it as a matter of law.

*Id.* (internal quotation marks and citations omitted); *see also Fortis Benefits v. Cantu*, 234 S.W.3d 642, 650 n.54 (Tex. 2007) (declining to construe insurance policy in a way that allowed for subrogation of claims unrelated to the policy); *Reilly*, 727 S.W.2d at 530 (refusing to construe partnership agreement as a matter of law in a way that was "potentially oppressive towards the limited partners . . . [and would] give the managing general partner the authority to drastically dilute the limited partners' [interests] so as to work a practical forfeiture."); *Shadow Dance Ranch P'ship, Ltd., v. Weiner*, No. 04-03-00926-CV, 2005 WL 3295664, at *4 (Tex. App.—San Antonio Dec. 7, 2005, no pet.) (mem. op.) (holding that appellant's construction of partnership agreement "taken to its logical conclusion, would allow [appellant] to ignore dissolution notices indefinitely and continue to demand capital until [appellee's] ownership interest is eliminated . . . thus produc[ing] an unjust, unreasonable, and oppressive result.") (internal quotation marks and alterations omitted).

We find the same criticisms applicable to Springer Ranch's proposed construction. When the 1993 contract was formed, each of the three sets of parties had two vertical wells on their respective tracts that included acreage from an adjacent party's property in their production units. The operator of some of those wells insisted that the parties agree on how the royalties from those wells would be allocated. To resume royalty payments, the parties agreed they would forego claims based on combined acreage within a production unit and would assign all royalties to the owner of the surface estate on which a well was situated. The intent of the parties to the 1993 contract was to bar claims for royalties based on "production units," not to allow one party to directly produce hydrocarbons from within the bounds of another's property. *Cf. Browning Oil*, 38 S.W.3d at 645 ("The intent of the parties as evidenced by the language of these leases was to award the

Lueckes royalties for one-eighth of the oil and gas produced from *their* land, not to provide a punitive remedy for a breach of the pooling provisions.").

Sullivan is entitled to one-eighth of the minerals within the bounds of her property under the lease. *See Japhet v. McRae*, 276 S.W. 669, 670–71 (Tex. Comm'n App. 1925, judgm't adopted) (holding that if a property is subject to a mineral lease and is later subdivided, the owners of the subdivided tracts are only entitled to royalties obtained from wells on their tract and are not entitled to the royalties from adjoining tracts simply because they were part of the original property); *Garza v. De Montalvo*, 217 S.W.2d 988, 993 (Tex. 1949) (affirming *Japhet*'s non-apportionment rule was still Texas law); *see Coastal Oil*, 268 S.W.3d at 15 ("The minerals owner is entitled . . . to 'a fair chance to recover the oil and gas in or under his land, *or* their equivalents in kind.'"). Over two-thirds of the SR2 well's horizontal length lies underneath Sullivan's property with the remaining one-third under Springer Ranch's property, and it is beyond cavil that the SR2 well produces hydrocarbons directly from within the bounds of Sullivan's property. *Cf. Coastal Oil*, 268 S.W.3d at 14 ("The gas produced through a deviated well does not migrate to the wellbore from another's property; it is already on another's property."). Springer Ranch's construction would have us hold that the parties intended that a party would have the right to produce and deplete the minerals directly from within another party's property. If we were to adopt its construction and take it to its logical conclusion, Springer Ranch would receive all of the SR2 well's royalties because the wellhead was on its property, even if the well obtained *all* of its production directly from underneath Sullivan's tract. This is not a utilitarian construction in light of the business activity the contract pertains to and is unreasonable, inequitable, and oppressive. *See Frost Nat. Bank*, 165 S.W.3d at 312; *Fortis Benefits*, 234 S.W.3d at 650 n.54; *Reilly*, 727 S.W.2d at 530; *Shadow Dance Ranch*, 2005 WL 3295664, at *4; *cf. Browning Oil*, 38 S.W.3d at 647 ("The Lueckes are entitled to the royalties for which they contracted, no more and no less.").

CONCLUSION

We construe the 1993 contract as requiring royalties to be allocated on the basis of the "productive portions" of the SR2 well underlying Springer Ranch's and Sullivan's properties. The uncontroverted and only evidence before us shows the productive portion of the SR2 well under Springer Ranch's property is the length of the well between the first takepoint and the property line. The productive portion under Sullivan's property is the length of the well between the property line and the last takepoint. The portion of the royalties to which Springer Ranch and Sullivan are entitled is determined by the ratio of the productive portions of the SR2 well on their respective properties to the entire length of the well, multiplied by the one-eighth lease royalty. The same proration of royalties shall apply to future horizontal wells on the parties' properties. We affirm the judgment of the trial court.

Luz Elena D. Chapa, Justice