ACCEPTED
04-14-00903-CV
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
4/1/2015 12:46:47 PM
KEITH HOTTLE
CLERK

## NO. 04-14-00903-CV

## FOURTH DISTRICT COURT OF APPEALS
## SAN ANTONIO, TEXAS

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
04/1/2015 12:46:47 PM
KEITH E. HOTTLE
Clerk

## LIGHTNING OIL COMPANY,
### Appellant,

v.

## ANADARKO E&P ONSHORE, LLC
## f/k/a ANADARKO E&P COMPANY, LP,
### Appellee.

*On Appeal from Cause No. 14-01-12171-DCVAJA*
*365th Judicial District Court, Dimmit County, Texas*
*Honorable Elma Salinas Ender, Visiting Judge, Presiding*

### APPELLEE'S BRIEF

**Shayne D. Moses**
State Bar No. 14578980
smoses@mph-law.com
**David A. Palmer**
State Bar No. 00794416
dpalmer@mph-law.com
**Timothy D. Howell**
State Bar No. 24002315
thowell@mph-law.com
**MOSES, PALMER & HOWELL, L.L.P.**
309 West 7th Street, Suite 815
Fort Worth, Texas 76102
817/255-9100
817/255-9199 (Fax)

**Donato D. Ramos**
State Bar No. 16508000
dondramos@yahoo.com
**Donato D. Ramos, Jr.**
State Bar No. 24041744
donatoramosjr@ddrlex.com
**LAW OFFICES OF
DONATO D. RAMOS, LLP**
6721 McPherson Road
P.O. Box 452009
Laredo, Texas 78045
956/722-9909
956/727-5885 (Fax)

### ATTORNEYS FOR APPELLEE

*ORAL ARGUMENT REQUESTED*

## IDENTIFICATION OF PARTIES AND COUNSEL OF RECORD

**Appellant:** Lightning Oil Company ("Lightning")

**Appellant's Counsel:** Bruce K. Spindler
John W. Petry
Stephen J. Ahl
LANGLEY & BANACK, INC.
Trinity Plaza II, Suite 900
745 East Mulberry Avenue
San Antonio, Texas 78212


**Appellee:** Anadarko E&P Onshore, LLC
f/k/a Anadarko E&P Company, LP
("Anadarko")

**Appellee's Counsel:** Shayne D. Moses
David A. Palmer
Timothy D. Howell
MOSES, PALMER & HOWELL, L.L.P.
309 W. 7th Street, Suite 815
Fort Worth, Texas 76102

Donato D. Ramos
Donato D. Ramos, Jr.
LAW OFFICES OF
DONATO D. RAMOS, LLP
6721 McPherson Road
P.O. Box 452009
Laredo, Texas 78045

ii

# TABLE OF CONTENTS

**Page No.**

IDENTIFICATION OF PARTIES AND COUNSEL OF RECORD .......................ii

TABLE OF CONTENTS.......................................................................iii

INDEX OF AUTHORITIES ................................................................. v

RECORD REFERENCES.................................................................... x

STATEMENT OF THE CASE .............................................................. 1

REQUEST FOR ORAL ARGUMENT.................................................... 2

ISSUE PRESENTED ......................................................................... 3

STATEMENT OF FACTS................................................................... 4

SUMMARY OF THE ARGUMENT...................................................... 20

ARGUMENT AND AUTHORITIES ..................................................... 21

    A.    *No subsurface trespass has occurred or will occur* ........................... 21

        i.    The Mineral Estate is a bundle of rights, not a physical space................................................................. 21

        ii.    None of the rights associated with the Mineral Estate have been damaged or are in jeopardy of being damaged ....... 36

    B.    *Lightning's consent is not necessary* ........................................ 45

    C.    *Additionally and/or alternatively, Anadarko is entitled to a no-evidence summary judgment* ......................................... 52

        i.    Trepass................................................................... 53

        ii.    Tortious Interference .................................................. 54

        iii.    Injunctive relief ........................................................ 55

PRAYER .............................................................................................. 56

CERTIFICATE OF COMPLIANCE WITH WORD LIMIT ................................... 58

CERTIFICATE OF SERVICE ......................................................................... 58

APPENDIX ........................................................................................... 59

# INDEX OF AUTHORITIES

**Cases**                                                                                    **Page No.**

*A.B.F. Freight Sys., Inc. v. Austrian Import Serv., Inc.*, 798 S.W.2d
    606 (Tex. App. – Dallas 1990, writ denied) .................................................. 40

*ACS Investors v. McLaughlin*, 943 S.W.2d 426 (Tex. 1997) ................................. 54

*Berry Contracting, Inc. v. Coastal States Petrochemical Co.*, 635 S.W.2d
    759 (Tex. App. – Corpus Christi 1982, writ ref'd n.r.e.) ............................. 40

*Birdwell v. Am. Bonding Co.*, 337 S.W.2d 120 (Tex. App. – Fort Worth
    1960, writ ref'd n.r.e.) ..................................................................................... 31

*Brown v. Humble Oil & Ref. Co.*, 83 S.W.2d 935 (Tex. 1935) ........................ 38,43

*Browning Oil Co., Inc. v. Luecke*, 38 S.W.3d 625 (Tex. App. – Austin
    2000, pet. denied) ........................................................................................... 38

*Burlington Res. Oil & Gas Co., LP v. Lang & Sons Inc.*, 259 P.3d
    766 (Mont. 2011) ............................................................................................ 29

*Butnaru v. Ford Motor Co.*, 84 S.W.3d 198 (Tex. 2002) ................................. 55,56

*Chevron Oil Co. v. Howell*, 407 S.W.2d 525 (Tex. Civ. App. – Dallas 1966,
    writ ref'd n.r.e.) ........................................................................................... 49,50

*Coastal Oil & Gas Corp. v. Garza Energy Trust*, 268 S.W.3d 1
    (Tex. 2008) ................................................................................ 26,33,38,42,43

*Department of Transp. v. Goike*, 560 N.W.2d 365 (Mich. Ct. App. 1996) ........... 29

*Dow Chemical Co. v. Francis*, 46 S.W.3d 237 (Tex. 2001) ............................. 21,52

*Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505
    (Tex. 1993) ...................................................................................................... 31

*Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 630 F.3d
    411 (5th Cir. 2011) ..................................................................................... 26,28

*Emeny v. United States*, 412 F.2d 1319 (Ct. Cl. 1969) ........................... 26,27

*Etan Indus., Inc. v. Lehmann*, 359 S.W.3d 620 (Tex. 2011)...................... 55

*Evanston Ins. Co. v. Legacy of Life, Inc.*, 370 S.W.3d 377 (Tex. 2012)............ 22,34

*FPL Farming, Ltd. v. Environmental Processing Systems, L.C.*, 351 S.W.3d
    306 (Tex. 2011).......................................................... 44,45

*French v. Chevron U.S.A. Inc.*, 896 S.W.2d 795 (Tex. 1995) ...................... 22

*Goose Creek Ice Co. v. Wood*, 223 S.W. 324 (Tex. Civ. App. –
    Galveston 1920, no writ)................................................... 44

*Greene v. Farmers Ins. Exch.*, 446 S.W.3d 761 (Tex. 2014)....................... 32

*Gulf Prod. Co. v. Continental Oil Co.*, 132 S.W.2d 533 (Tex. 1939)............... 27

*Hastings Oil Co. v. Texas Co.*, 234 S.W.2d 389 (Tex. 1950)...................... 36,37

*Humble Oil & Refining Co. v. L & G Oil Co.*, 259 S.W.2d 933
    (Tex. Civ. App. – Austin 1953, writ ref'd n.r.e.)......................... 46,47

*Humble Oil & Refining Co. v. West*, 508 S.W.2d 812 (Tex. 1974)................. 26

*Lightning Oil Co. v. Anadarko E&P Onshore*, No. 04-14-00152-CV,
    2014 Tex. App. LEXIS 11844 (Tex. App. – San Antonio
    Oct. 29, 2014, pet. filed) ............................................... 4

*Lone Star Gas Co. v. Murchison*, 353 S.W.2d 870 (Tex. Civ. App. –
    Dallas 1962, writ ref'd n.r.e.) ........................................ 30

*Maranatha Temple, Inc. v. Enterprises Prods. Co.*, 833 S.W.2d 736
    (Tex. App. – Houston [1st Dist.] 1992, writ denied) .................... 21,53

*Marcus Cable Associates, L.P. v. Krohn*, 90 S.W.3d 697 (Tex. 2002) ............ 35

*McAlister v. Eclipse Oil Co.*, 98 S.W.2d 171 (Tex. 1936)......................... 34

*Natural Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188 (Tex. 2003)...............29

*Oryn Treadway Sheffield, Jr., Trust v. Consolidation Coal Co.*, 819
    F.Supp.2d 625 (W.D. Va. 2011), *aff'd*, 497 Fed. Appx. 318
    (4th Cir. 2012)............................................................................29

*Phillips Petroleum Co. v. Cowden*, 241 F.2d 586 (5th Cir. 1957)...........42

*Phillips Petroleum Co. v. Cowden*, 256 F.2d 408 (5th Cir. 1958)...........42

*Pomposini v. T.W. Phillips Gas & Oil Co.*, 580 A.2d 776
    (Pa. Super. Ct. 1990)..................................................................29

*Prize Energy Res., L.P. v. Cliff Hoskins, Inc.*, 345 S.W.3d 537
    (Tex. App. – San Antonio 2011, no pet.)...............................53

*Prudential Ins. Co. of Am. v. Financial Review Servs., Inc.*, 29 S.W.3d
    74 (Tex. 2000)...................................................................39,54

*Railroad Comm'n of Texas v. Manziel*, 361 S.W.2d 560 (Tex. 1962)..........32,33,35

*Roberts v. U.S. Home Corp.*, 694 S.W.2d 129 (Tex. App. – San Antonio
    1985, no writ)..............................................................................40

*Springer Ranch, Ltd. v. Jones*, 421 S.W.3d 273 (Tex. App. –
    San Antonio 2013, no pet.) .................................23,24,25,26,27,35

*Stephens County v. Mid-Kansas Oil & Gas Co.*, 254 S.W.2d 290
    (Tex. 1923)...................................................................................34

*Sun Oil Co. v. Whitaker*, 424 S.W.2d 216 (Tex. 1968)...........................55

*Sutton v. Green*, No. 14-01-01043-CV, 2002 Tex. App. LEXIS
    4983 (Tex. App. – Houston [14[th] Dist.] Jul. 11, 2002, no pet.)...........31

*Tawes v. Barnes*, 340 S.W.3d 419 (Tex. 2011)....................................51

*Texas Co. v. Daugherty*, 176 S.W. 717 (Tex. 1915)..........................29,34

*Texas Dep't of State Health Servs. v. Balquinta*, 429 S.W.3d 726
(Tex. App. – Austin 2014, pet. dism'd) .......................................... 55

*Texas Pipe Line Co. v. Hildreth*, 225 S.W. 583 (Tex. Civ. App. –
Fort Worth 1920, no writ) .............................................................. 40

*Valenzuela v. Aquino*, 853 S.W.2d 512 (Tex. 1993) ................................ 55

*Villarreal v. Grant Geophysical, Inc.*, 136 S.W.3d 265 (Tex. App. –
San Antonio 2004, pet. denied).................................................... 43

*Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849 (Tex. 2000)............... 40

*Watkins v. Certain-Teed Products Corp.*, 213 S.W.2d 981 (Tex. Civ.
App. – Amarillo 1950, no writ)...................................................... 37

*Wilen v. Falkenstein*, 191 S.W.3d 791 (Tex. App. – Fort Worth 2006,
pet. denied) ..................................................................................... 53

## Statutes and Other Sources

31-A TEX.JUR. 27.................................................................................... 30

Owen L. Anderson, *Lord Coke, the Restatement and Modern
Subsurface Trespass Law*, 6 TEX. J. OIL, GAS & ENERGY
LAW 203 (2011)............................................................................. 48

Owen L. Anderson, *Subsurface "Trespass": A Man's Subsurface
Is Not His Castle*, 49 WASHBURN L.J. 247 (2010)........................ 49

Restatement (Second) of Torts § 822 cmt. G (1997) ............................. 44

TEX. CIV. PRAC. & REM. CODE § 65.012(a)................................... 39,55

TEX. R. CIV. P. 166a(i)......................................................................... 52

TEX. R. EVID. 201 ................................................................................. 5

H. Philip Whitworth & Davin McGinnis, *Square Pegs, Round Holes:*
*The Application and Evolution of Traditional Legal and Regulatory*
*Concepts for Horizontal Wells*, 7 TEX. J. OIL, GAS & ENERGY
LAW, 177 (2011/2012)................................................................... 48

# RECORD REFERENCES

Record citations in this brief are to the Clerk's Record (CR) and the Supplemental Clerk's Record (1 Supp. CR).

Testimony and exhibits from the temporary injunction hearing are also addressed because they were made a part of the summary judgment record. However, the portions of the transcript and exhibits that were attached to Anadarko's motion for summary judgment were requested to be included,[1] but were omitted, from the Clerk's Record. Anadarko has requested that the Clerk's Record be supplemented to include the missing items. In the meantime, citations to testimony and exhibits from the temporary injunction hearing that were made a part of the summary judgment record but inadvertently omitted from the Clerk's Record are cited as "Temporary Injunction Transcript" and "Temporary Injunction Exhibit". Once the Clerk's Record is supplemented, Anadarko requests leave to file a corrected brief with citations to the same.

---

[1] CR 813. In addition to Lightning's Request for Clerk's Record, Anadarko filed a Supplemental Designation of Clerk's Record clarifying that its motion for summary judgment and other items were to be included in the Clerk's Record. Anadarko did so because the titles or dates of certain items were misidentified in part in Lightning's request. It appears Anadarko's Supplemental Designation of Clerk's Record was also omitted from the Clerk's Record despite Anadarko's request that it be included.

# STATEMENT OF THE CASE

This is an appeal of an order denying summary judgment for Lightning and granting summary judgment for Anadarko (the "Order").[2] By agreement of the parties, the trial court severed the Order from "the remaining claims" (which consisted only of Anadarko's claim for attorney fees and costs) so it could be immediately appealed.[3] This appeal arises out of Lightning's claim, meritless though it is, for subsurface trespass on a mineral estate. Lightning asserts causes of action against Anadarko for trespass and tortious interference with contract, and seeks declaratory and injunctive relief. Lightning is the lessee of the mineral estate (the "Mineral Estate") underlying approximately 3,251.53 surface acres (the "Surface Estate") in Dimmit County, Texas. The gravamen of Lightning's claims is that Anadarko, with the permission of the owner of the Surface Estate, Briscoe Ranch, Inc. ("Briscoe"), plans to utilize a location on the Surface Estate to drill, operate and produce one or more horizontal wells that will traverse – or in Lightning's words merely "go through"[4] – some of the subsurface lands surrounding a portion of the Mineral Estate, but **not** produce from the Mineral Estate. Instead, Anadarko's proposed wells will produce only from an adjacent mineral estate owned by Anadarko.

---

[2] CR 804.
[3] CR 805.
[4] Lightning's Brief, at 7.

1

## REQUEST FOR ORAL ARGUMENT

Anadarko respectfully requests oral argument. Anadarko believes oral argument will significantly aid the Court's decision process and is in order in light of the gravity of the legal issues involved and the potential impact of this case on the oil and gas industry.

# ISSUE PRESENTED

The owner of the Surface Estate consents to Anadarko's proposed activities, none of which will cause damage to or otherwise interfere with the bundle of rights associated with Lightning's Mineral Estate. Anadarko's wellbores will bottom on and produce solely from a mineral estate owned by Anadarko. They will merely pass through a part of the subsurface mass – which surrounds a portion of the Mineral Estate but is part of the Surface Estate – and will be incapable of producing any minerals directly from Lightning's Mineral Estate. Under these circumstances, did the trial court correctly deny summary judgment for Lightning and grant a traditional and/or no-evidence summary judgment for Anadarko on Lightning's causes of action for trespass and tortious interference as well as on Lightning's request for injunctive relief premised upon a trespass?

3

## STATEMENT OF FACTS

1. This appeal is the latest in Lightning's misguided, albeit tireless, attempt to show a subsurface trespass. After the trial court initially granted an *ex parte* temporary restraining order against Anadarko,[5] it conducted an evidentiary hearing and denied Lightning's request for a temporary injunction.[6] Lightning filed a Motion to Reconsider and Grant Application for Temporary Injunction,[7] as well as an Amended Motion to Reconsider and Amended Motion for Injunctive Relief and Motion to Grant Application for Temporary Injunction and Request for the Court to Consider Additional Evidence,[8] which the trial court also denied.[9] Lightning then sought an accelerated appeal, in which this Court affirmed the trial court's denial of Lightning's request for a temporary injunction.[10] As part of its accelerated appeal, Lightning filed a Motion for Temporary Orders to Preserve Jurisdiction and Rights Pending Appeal that was also denied by this Court. On the same day it filed its brief in this appeal, Lightning filed a Petition for Review (which remains pending) with the Texas Supreme Court in which it challenges this

---

[5] CR 12.
[6] CR 31.
[7] CR 32.
[8] CR 250.
[9] CR 269.
[10] *Lightning Oil Co. v. Anadarko E&P Onshore*, No. 04-14-00152-CV, 2014 Tex. App. LEXIS 11844 (Tex. App. – San Antonio Oct. 29, 2014, pet. filed).

4

Court's disposition of its accelerated appeal.[11] Lightning has now been denied summary judgment by the trial court, which correctly granted summary judgment for Anadarko.[12] This appeal followed. Thus, by bringing this appeal, Lightning seeks to take no less than its seventh bite at the apple.

2.  With this procedural background in mind, Anadarko turns to the facts. The statement of facts in Lightning's brief is only partially correct and in some respects is patently wrong. The facts relevant to this appeal can be summarized more accurately as follows.

3.  The parties' respective leasehold interests and acreage positions are undisputed and are accurately identified in Lightning's brief.[13] However, Lightning inaccurately characterizes this as "a subsurface trespass case."[14] It is not, no matter how many times or in how many courts Lightning attempts to portray it as one. Anadarko has drilled no wells through Lightning's Mineral Estate at this juncture; thus, no trespass could have occurred. Moreover, as shown below, Lightning's trespass argument is based on the faulty premise that its Mineral Estate encompasses a particular space as opposed to a bundle of rights. In

---

[11] Anadarko asks this Court to take judicial notice of Lightning's Motion for Temporary Orders to Preserve Jurisdiction and Rights Pending Appeal filed in this Court and its Petition for Review filed in the Texas Supreme Court. TEX. R. EVID. 201. Neither document is included in the Clerk's Record as they were not filed with the trial court.

[12] CR 804.

[13] Lightning's Brief, at 1-2.

[14] Lightning's Brief, at viii.

5

short, no trespass has occurred or will occur both as a matter of fact and a matter of law.

4.      As it has done at each stage of this case, Lightning takes great liberties with the "facts" actually contained in the record. In many instances, Lightning continues to advance the same mischaracterizations of the record despite the fact Anadarko has repeatedly pointed out they are inaccurate. Still, Anadarko has no choice but to address them – as it has repeatedly done in its briefing in prior proceedings – so this Court is not left with the wrong impression.

5.      For instance, Lightning writes that by granting summary judgment for Anadarko the trial court "essentially ruled that Anadarko could go forward with its plan to drill 65 to 75 oil-and-gas wells through Lightning's mineral estate."[15] In truth, Anadarko's current plans involve only one drill site on the Surface Estate and no more than five wells.[16] The portions of Anadarko's planned wellbore(s) that will traverse the area surrounding part of Lightning's Mineral Estate will be cased and incapable of draining hydrocarbons.[17] In sum, Anadarko will produce only those hydrocarbons it has a right to produce from its own adjacent mineral estate.

---

[15] Lightning's Brief, at viii.
[16] CR 299; CR 509, at ll. 1-2; Temporary Injunction Transcript, at p. 91, ll. 13 through p. 92, l. 17.
[17] CR 299, 302.

6.    In a related point, Lightning represents that Anadarko claims "it is unable to operate on the surface of the Chaparral."[18] Later in its brief, Lightning writes that "Anadarko appears to have now abandoned its argument that it has to drill through the Cutlass Lease because it cannot drill on the Chaparral."[19] Anadarko has not abandoned any such argument because it never made it. Rather, it has pointed out – accurately so – that the surface acreage covered by the Chaparral Wildlife Management Area Lease consists of a state-owned and managed wildlife sanctuary and public hunting grounds. Thus, it comes as no surprise that the Chaparral Wildlife Management Area Lease includes surface restrictions requiring that drill sites "must be planned and authorized by the Land Manager" and that Anadarko must use offsite locations "when prudent and feasible."[20] These surface use restrictions are irrelevant to whether a trespass will occur. However, they are provided for background because they are the reason Anadarko secured written permission from Briscoe, as the owner of the Surface Estate, to use a location on the Surface Estate to drill, operate and produce one or more horizontal wells, the wellbore(s) of which will cross through an area that is owned by Briscoe, the Surface Estate owner, but produce only from Anadarko's Chaparral Wildlife Management Area Lease.[21] In addition to the General Land

---

[18] Lightning's Brief, at 4.
[19] Lightning's Brief, at 6.
[20] CR 301-02, 309; Temporary Injunction Transcript, at p. 85, ll. 11-14.
[21] CR 320.

Office, certain members of the Light family who own interests in Lightning also own interests in the minerals covered by the Chaparral Wildlife Management Area Lease.[22] That their leases do not contain surface restrictions does not relieve Anadarko from its obligation to comply with those set forth in the Chaparral Wildlife Management Area Lease.

7. Lightning suggests there is an agreement for Anadarko to use the surface of the Chaparral Wildlife Management Area Lease because "Anadarko has been in possession of a proposed Texas Parks and Wildlife surface-use agreement for well over two years."[23] Anadarko has not signed the proposal because the parties have not reached an agreement on its terms. Lightning did not and could not produce evidence that Anadarko has acted improperly by not accepting the terms and signing the proposal. In fact, the only conclusion that can be reached from the summary judgment evidence is that Anadarko acted within its rights in electing not to sign the Texas Parks and Wildlife's proposed surface use agreement.

8. Lightning also writes that "various oil-and-gas operators have drilled at least 14 to 19 wells on the surface of the" Chaparral Wildlife Management Area Lease.[24] The record says nothing about "various" operators having done so; it

---

[22] CR 464, at ll. 7-16; Lightning's Brief, at 2.
[23] Lightning's Brief, at 5.
[24] Lightning's Brief, at 2.

8

merely reflects that wells have been drilled.[25] Regardless, that fact is irrelevant because the undisputed summary judgment evidence is that "Anadarko has been unable to secure permission to develop the Chaparral Wildlife Management Area Lease from the surface directly above it."[26] Moreover, even if it had secured permission to do so, it would not have been precluded from utilizing Briscoe's Surface Estate in light of the agreement it reached with Briscoe.

9.    Lightning posits that "Anadarko can continue to meet its drilling obligations pursuant to the terms of the Chaparral Lease … without accessing the Chaparral Lease estate through the Cutlass mineral estate" because Anadarko can simply drill from the Rancho Encantado.[27] This statement is irrelevant because it, too, has no bearing on the trespass issue. Moreover, it is untrue. In support of this proposition, Lightning cites the testimony of its owner,[28] Walter Scott Light, at the temporary injunction hearing. In actuality, Anadarko's counsel informed the trial court at the hearing that it is "disingenuous to suggest Anadarko could produce everything from the Rancho Encantado [on] to the Chaparral Wildlife Lease"[29] because "you can't drill long enough laterals to get the entire Chaparral Wildlife area developed; so you would lose, approximately, 85 percent of the reserves associated with the Chaparral Wildlife area if you leave this conjunction [sic] in

---

[25] 1 Supp. CR 416.
[26] CR 302.
[27] Lightning's Brief, at 3.
[28] CR 462, at ll. 13-16.
[29] Temporary Injunction Transcript, at p. 26, l. 24 through p. 27, l. 1.

9

place."[30] Anadarko is cognizant that statements by its counsel are not evidence. However, they are consistent with Mr. Light's admissions on cross-examination in which he agreed that using the Rancho Encantado's surface would only be a temporary solution as 85% of the Chaparral Wildlife Management Area's reserves could not be reached from there:

Q: Now, the two wells you've drilled have laterals of less than 4,000 feet, don't they?

A: Yes. I think so.

Q: Now, Anadarko's proposed laterals you've seen are as much as 8,000 feet?

A: I see that.

Q: So, even if Anadarko was drilling a lateral twice as long as yours, if it's precluded from using these north and south locations and only comes from the Rancho Encantado as you suggested, it's going to lose 85 percent of the production from the Wildlife Management Area, isn't it?

A: If they stop and not get [sic] on the Parks & Wildlife, that is true."[31]

10. Lightning continues the mantra it has used from the outset of this case that Anadarko's proposed activities will supposedly interfere with its ability to develop its Mineral Estate. In doing so, Lightning contends that Anadarko's proposed actions "will adversely affect Lightning's proposed Cutlass West A-5 well" and "will require Lightning to deviate its wells in ways that are not

---

[30] Temporary Injunction Transcript, at p. 29, ll. 17-23.
[31] Temporary Injunction Transcript, at p. 97, ll. 5-18.

10

operationally advisable and will result in substantial cost and damage to Lightning."[32] These conclusory statements lack support in the summary judgment evidence. Moreover, they are not "uncontroverted" as Lightning says because they directly contradict Lightning's prior testimony, which was "I can't quantify what that cost is right now but there will be added costs."[33] Most importantly, however, these inconsistent statements have no bearing on whether or not a subsurface trespass would occur if Anadarko drills from Briscoe's Surface Estate.

11.    To support its interference allegation, Lightning also attempts to invoke conclusory statements in Mr. Light's affidavit that Anadarko's proposed operations "will cause significant interference with Lightning's planned development of its mineral estate attributable to the Cutlass Lease and create offset drilling obligations on the part of Lightning that do not exist today and likely would not exist if Anadarko drilled its wells on the surface estate attributable to its own Chaparral Wildlife Management Area lease."[34] These statements, too, are speculative and directly contradict Mr. Light's testimony at the temporary injunction hearing. For example, with respect to the pertinent site and wells, Mr. Light admitted that with respect to his "Proposed Site No. 2, ... [his] planned wellbore would never encounter any portion of Anadarko's planned wellbores."[35]

---

[32] Lightning's Brief, at 9.

[33] CR 514, at ll. 2-6.

[34] Lightning's Brief, at 4.

[35] Temporary Injunction Transcript, at p. 91, ll. 1-4.

In fact, Mr. Light conceded that "with respect to Anadarko's proposed surface location, there is no way on God's green earth it will interfere with [Lightning's] proposed Cutlass 3 well ... ."[36] The petroleum engineer who testified on Lightning's behalf, Gary Bagnall, similarly admitted that "the drilling of those five wells would not interfere with Lightning drilling their [sic] No. 3 well."[37] Mr. Bagnall also testified that he knows for a fact that "the Cutlass 3 can be drilled without any problem from the five proposed wells" and that he "should be able" to identify and avoid any encounter with Anadarko's wellbore paths.[38]

12.    The most Lightning's witnesses could muster was a suggestion that there could potentially be damage **if** a blowout were to occur and that the five wells (again, not 65 to 75 wells) Anadarko plans to drill from the surface location in question **could** cause Lightning difficulty in drilling a potential "protection well" that is "on the drawing board."[39] Mr. Light acknowledged that there is only a "possibility, not a probability" of a casing failure that could harm Lightning's

---

[36] Temporary Injunction Transcript, at p. 92, ll. 11-17.
[37] CR 507, at l. 22 through CR 508, at l. 2; Temporary Injunction Transcript, at p. 137, l. 25 through p. 138, l. 1; Temporary Injunction Transcript, at p. 141, ll. 12-16.
[38] Temporary Injunction Transcript, at p. 141, ll. 12-16; Temporary Injunction Transcript, at p. 142, l. 16 through p. 143, l. 2.
[39] CR 505, at ll. 6-22; CR 508, at ll. 6-14; CR 509, at ll. 1-2.

Mineral Estate,[40] and Mr. Bagnall testified that the chances of a well control issue that could damage the formation are miniscule at best.[41]

13.    Lightning significantly overstates, if not misrepresents, the record by writing that "[t]o an absolute certainty, Anadarko will bring to the surface hydrocarbons from the [Mineral Estate]" and, similarly, that "some of the hydrocarbons [from its Mineral Estate] will be displaced and brought to the surface" by Anadarko.  It cites no evidence for these bold statements, and there is none.  The summary judgment evidence establishes that Anadarko will not perforate a wellbore while under any land covering Lightning's Mineral Estate; instead, it will only produce from acreage that underlies the Chaparral Wildlife Management Area Lease.[42]  In addition, the record shows it is industry standard to accommodate nearby operators and that Anadarko will do so here if and as reasonably necessary.[43]  It also confirms Anadarko intends to comply with all field rules.[44]  Finally, the take points for Anadarko's wells will not vary significantly based on the surface locations of the wells.  The bottom hole locations and perforations from which production will occur will be substantially the same regardless of whether the surface location is on the Chaparral Wildlife Area or the

---

[40] Temporary Injunction Transcript, at p. 99, ll. 2-7.

[41] Temporary Injunction Transcript, at p. 132, ll. 13-19; Temporary Injunction Transcript, at p. 142, ll. 3-13.

[42] CR 299, 302.

[43] CR 740.

[44] CR 299, 302.

13

Briscoe Surface Estate. Thus, Lightning's claim regarding displaced hydrocarbons is not only unsupported by the summary judgment evidence, it is incorrect. Thus, the trial court correctly denied Lightning's request for temporary injunctive relief based on a finding "that there is no interference with the leaseholder of the Cutlass lease"[45] and later correctly granted summary judgment for Anadarko for that same reason.

14.     Lightning repeats another false allegation it has advanced before, suggesting that it became aware of Anadarko's desire to use the Surface Estate as a drill site for production from the Chaparral Wildlife Management Area only after it discovered stakes marking Anadarko's proposed well locations and "confronted Anadarko."[46] It does so despite the fact Anadarko has pointed out the inaccuracy of this allegation every time Lightning has made it. Again, what occurred in this regard is irrelevant to the trespass issue. However, because Lightning repeats the allegation, Anadarko will repeat its recitation of the true facts in order to set the record straight.

15.     Anadarko contacted Lightning months before it staked its initial proposed site and was fully transparent about its plans.[47] This transparency prompted Lightning to take steps aimed at trying to frustrate those plans and to

---

[45] CR 586, at ll. 4-8.
[46] Lightning's Brief, at 9.
[47] Temporary Injunction Transcript, at p. 82, l. 16 through p. 83, l. 1.

create conflicts where none previously existed.[48] Within days after Anadarko staked a proposed location on the Surface Estate, for example, Lightning for the first time professed a need to use the same site and staked the same location.[49] Just prior to the temporary injunction hearing, Lightning rushed to obtain permits to drill from that site, admittedly for the purpose of presenting evidence to the trial court at the injunction hearing.[50] Despite Lightning's legal maneuvering and the fact it was not obligated to do so, Anadarko moved its original planned location to a different site to accommodate Lightning and to avoid any claim of potential interference with Lightning's newly professed surface needs.

16.    In another effort to put a black hat on Anadarko, Lightning accuses it of "encourag[ing] Lightning's working-interest partners [sic] to jointly develop the [Cutlass Lease] acreage on the condition that Lightning and its affiliates sell their interests in the Cutlass Lease, with Anadarko effectively serving as the operator."[51] This rhetoric, too, is irrelevant. Regardless, Anadarko has previously debunked it, yet Lightning is undeterred in using it. As confirmed by the summary judgment evidence, Anadarko did not initiate contact with the working interest owners in the Cutlass Lease. To the contrary, the first contact was an unsolicited communication in June 2014 to Anadarko from Alan Dille with Resource Legacy Investments,

---

[48] Temporary Injunction Transcript, at p. 96, ll. 12-16.

[49] *Id.*; Temporary Injunction Transcript, at p. 95, ll. 21-25.

[50] Temporary Injunction Transcript, at p. 96, l. 1 through p. 97, l. 4; Temporary Injunction Anadarko Exhibit 79.

[51] Lightning's Brief, at 4.

LLC in which Mr. Dille expressed a belief that Anadarko has low, "best in class" drilling costs and that all working interest owners would likely participate in pooling their interests with Anadarko if a workable structure could be found.[52] Thus, the truth is that the majority working interest owners in the Cutlass Lease question Lightning's procedures when compared to those of Anadarko and reached out to Anadarko, not vice versa.

17.    Finally, Lightning identifies what it dubs "The Proprietary Problem," in which it suggests that Anadarko's proposed drilling activities will result in a misappropriation of "detailed confidential proprietary information concerning" the Mineral Estate, including cuttings, mineral cores and mud logs.[53] There is no evidence to support such a claim, nor is there any evidence that Anadarko would not have access to the same data if it drilled from other area locations about which Lightning could not complain, including those it says Anadarko should utilize.

18.    Regardless, this "problem" exists only in Lightning's imagination. The summary judgment evidence established that Anadarko will perforate its wellbores for production only under the Chaparral Wildlife Management Area Lease.[54] Moreover, Anadarko will conduct only minimal testing. For example, it will utilize a basic gamma ray log and use simple mud gas detection equipment in

---

[52] CR 740, 744.
[53] Lightning's Brief, at 10-11.
[54] CR 299.

order to comply with applicable laws and industry standards and to ensure it can safely and effectively drill its laterals in the Eagle Ford formation and **avoid** perforating its wellbores in the area surrounding Lightning's Mineral Estate.[55] Anadarko will not run mud logs.[56] After the first well is drilled from a well pad, Anadarko intends to run only the gamma ray log from roughly a 7,000-foot depth (kickoff point) to TD or total depth.[57] Other than assuring the wells are drilled safely and properly, the information garnered from these basic procedures is of no real value to Anadarko and will not be detrimental to Lightning.[58] If Anadarko was seeking information proprietary to Lightning, or intended to produce Lightning's minerals, it would run a full suite of logs while in the area encompassing the Mineral Estate.[59] It will not do so because it has no such intention.[60]

19.    With the foregoing undisputed facts in mind, Anadarko moved for summary judgment on each of Lightning's claims on the following traditional grounds:

(a)    no subsurface trespass has occurred or will occur on Lightning's Mineral Estate as a matter of law;

---

[55] CR 299, 740-41.
[56] *Id.*
[57] *Id.*
[58] *Id.*
[59] *Id.*
[60] *Id.*

(b)     Anadarko's proposed activities are authorized by Briscoe, as the owner of the Surface Estate, such that Lightning's consent is not necessary;

(c)     Anadarko's proposed activities have not resulted and will not result in any damage to Lightning or the Mineral Estate;

(d)     Anadarko has the right to drill wells from the Surface Estate and is entitled to a declaration of the same;

(e)     Anadarko's actions are justified such that there is no tortious interference; and

(f)     Lightning's request for injunctive relief is a remedy, not a cause of action, to which Lightning is not entitled.[61]

20.     Alternatively, pursuant to Rule 166a(i) of the Texas Rules of Civil Procedure, Anadarko moved for summary judgment:

(aa)    on Lightning's trespass claim because there is no evidence that:

(1)     Anadarko's proposed activities have injured, or will injure, Lightning's right to possess the Mineral Estate or its right or ability to produce minerals therefrom;

(2)     Anadarko lacks authority to conduct the proposed activities; and

---

[61] CR 272.

18

(3) Lightning has standing to complain about Anadarko's activities.[62]

(bb) on Lightning's claim for tortious interference because there is no evidence that:

(1) Anadarko's proposed activities have proximately caused, or will proximately cause, any damage to Lightning's Mineral Estate;

(2) actual damage or loss to Lightning's Mineral Estate has occurred or will occur as a result of Anadarko's proposed activities or that Anadarko's activities will interfere with any of Lightning's rights in the Mineral Estate;

(3) Lightning has standing to complain about Anadarko's activities; and

(4) Anadarko's conduct or proposed conduct is not justified.

21. The trial court granted summary judgment for Anadarko without specifying the grounds on which it did so.[63] The trial court severed "the remaining claims" so the Order would become final and appealable.[64] Lightning contends "[t]hose remaining claims relate to Lightning's cause of action for tortious

---

[62] CR 273.
[63] CR 804.
[64] CR 805.

19

interference and Anadarko's assertion of affirmative defenses thereto."[65] In actuality, Lightning's cause of action for tortious interference is subsumed by the Order because Anadarko moved for summary judgment on that claim[66] and the trial court granted Anadarko's motion in its entirety.[67] Thus, the only remaining claim is Anadarko's request for attorney fees and costs pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code, which is the only claim not disposed of by the Order.[68] Regardless, in light of the severance, no remand is necessary if this Court affirms the Order as it should because all issues as to Anadarko's attorney fees and costs remain pending before the trial court and can be resolved once this appeal is concluded.

## SUMMARY OF THE ARGUMENT

22. Anadarko's proposed activities do not and will not constitute a trespass under Texas law. Possession of a mineral estate entitles one to produce the minerals and associated rights; it does not constitute the right to a specific area or place below the "surface" of the Earth. Nothing Anadarko has done or proposes to do will trample on any right associated with Lightning's Mineral Estate. Thus, there can be no trespass, tortious interference or damages as a matter of fact or law. Accordingly, the trial court correctly denied summary judgment for Lightning and

---

[65] Lightning's Brief, at 45.
[66] CR 272-73.
[67] CR 804.
[68] CR 295, 804.

20

granted summary judgment for Anadarko on all of Lightning's claims, including its remedial request for injunctive relief.

## ARGUMENT AND AUTHORITIES

23. "When a trial court's order granting summary judgment does not specify the ground or grounds relied on for its ruling, summary judgment will be affirmed on appeal if any of the theories advanced are meritorious."[69] With this standard in mind, the Order should be affirmed for any or all of the reasons discussed below.

### A. *No subsurface trespass has occurred or will occur.*

#### i. The Mineral Estate is a bundle of rights, not a physical space.

24. "The gist of an action of trespass is the injury to the right of **possession**."[70] Anadarko's proposed activities will not constitute a trespass under Texas law because possession of a mineral estate entitles one to produce the minerals and associated rights, not to possess a specific area or place below the "surface" of the earth. Lightning misconstrues the nature of its Mineral Estate, apparently believing it is defined solely by a location or depth such that the mere presence of Anadarko's wellbores beneath the surface of the earth in the area surrounding the Mineral Estate will amount to a trespass on the Mineral Estate.

---

[69] *Dow Chemical Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001).
[70] *Maranatha Temple, Inc. v. Enterprise Prods. Co.*, 833 S.W.2d 736, 739 (Tex. App. – Houston [1st Dist.] 1992, writ denied) (emphasis in original).

21

However, the Mineral Estate is not a definable physical place entitling Lightning to an absolute right to possess or occupy a specific depth or location in the ground. To the contrary, it is a bundle of rights entitling Lightning to produce minerals and rights attendant thereto. Lightning's entire position is premised on its misconception of the Mineral Estate because it assumes Anadarko will "enter" some physical space Lightning has the exclusive right to occupy. Once this misconception is disposed of, all of Lightning's claims implode.

25. As it has done before, Lightning accuses Anadarko of attempting to limit Lightning's bundle of rights in its Mineral Estate "solely to five 'attributes.'"[71] It is unclear what material Lightning is reading because Anadarko has repeatedly written that, while various cases formulate the rights included in that bundle differently,[72] it recognizes "[s]ome of the key rights in American jurisprudence that make up the bundle of property rights include the rights to possess, use, transfer and exclude others."[73] However, Anadarko has found no case (and Lightning cites none) which actually supports Lightning's argument that its Mineral Estate includes a physical location. Thus, Lightning's bundle of rights,

---

[71] Lightning's Brief, at 28.

[72] *See, e.g., French v. Chevron U.S.A. Inc.*, 896 S.W.2d 795, 797 (Tex. 1995) (holding that "[a] mineral estate consists of five interests: 1) the right to develop, 2) the right to lease, 3) the right to receive bonus payments, 4) the right to receive delay rentals, and 5) the right to receive royalty payments"); *Evanston Ins. Co. v. Legacy of Life, Inc.*, 370 S.W.3d 377, 383 (Tex. 2012) (observing that "[s]ome scholars have observed that there are eleven core rights in the bundle of property rights" and that "[m]any jurisdictions use variations of these rights to form the notion of 'fee simple' ownership of real property").

[73] *Evanston*, 370 S.W.3d at 383.

irrespective of the words used to define it, is not impacted here because Anadarko's wells will not produce from Lightning's Mineral Estate. Anadarko makes no claim to Lightning's Mineral Estate whatsoever and it does not seek to, and will not, dispossess Lightning of the minerals it is entitled to produce.[74] Thus, Anadarko will not interfere with, or trespass on, any of Lightning's bundle of rights as it is not developing, possessing, using or enjoying any of the hydrocarbons Lightning has a right to produce from the Mineral Estate.

26. There is extensive law in Texas and other jurisdictions, including this Court's recent opinion in *Springer Ranch, Ltd. v. Jones*,[75] confirming the Mineral Estate connotes a bundle of rights, not a definable, physical, underground place as Lightning contends. In *Springer*, this Court was called upon to determine how royalties from a horizontal well that traversed both parties' properties were to be allocated under a contract requiring payment "to the owner of the surface estate on which such well or wells are situated … ."[76] Justice Chapa wrote the well was "situated 'on' more than one 'surface estate'"[77] such that royalties were to be allocated based on the productive portions of the well underlying the parties' respective properties.[78]

---

[74] CR 299, 742.
[75] 421 S.W.3d 273 (Tex. App. – San Antonio 2013, no pet.).
[76] *Id.* at 277.
[77] *Id.*
[78] *Id.* at 289.

23

27.   In arriving at its holding in *Springer*, this Court construed "surface estate" to mean "the portions of the earth, over which the surface estate owner holds dominion after a severance of the mineral estate."[79] Lightning attempts to give *Springer* short shrift in that it did not involve a trespass claim, injunctive relief or real property because it dealt with minerals that had been produced and, thus, had become personal property.  The fact Lightning distinguishes between real and personal property on this basis is interesting because Anadarko has repeatedly pointed out that the Mineral Estate denotes rights to minerals in place – not rights to a place – in part because minerals in place become personal property once they are brought to the surface.  It is the right to produce those minerals, not the subsurface mass from which they are produced, to which Lightning can lay claim. *Springer* confirms this truism.

28.   Regardless, the fact the causes of action or requests for relief asserted in *Springer* differ from those Lightning asserts in this case is irrelevant because this Court noted in *Springer* that "[w]e fail to see why the meaning of 'surface estate' should vary from one context to another."[80]  Of particular relevance to the present case, this Court went on to explain:

> To understand what mineral and surface estate owners actually own, we must discuss the relationship between hydrocarbons and the earth surrounding them.  Hydrocarbons reside within porous formations or

---

[79] *Id.* at 282.
[80] *Id.* at 284.

reservoirs of rock under immense pressure from the overlaying earth. When the porous reservoir is pierced by a well, the pressure of the impermeable earth above the reservoir and internal forces from within the reservoir, such as water trapped with the hydrocarbons, push the hydrocarbons out of the formation and into the well.

With that understanding in mind, we note **ownership of the hydrocarbons does not give the mineral owner ownership of the earth surrounding those substances.**[81]

. . .

We note that the physical structures and subsurface substances that the surface estate and mineral estate owners possess are inherently intertwined, at least with respect to hydrocarbons. Some conflation is unavoidable. However, **if there are no minerals beneath the surface, the mineral estate owner owns the legal fiction of an estate that is nothing.**[82]

In sum, the Mineral Estate is defined by the rights it embraces, not by a physical depth or location as Lightning suggests. The earth surrounding the minerals is part of the Surface Estate the owner of which, Briscoe, has authorized Anadarko's actions.

29. Lightning avers that this Court's holding in *Springer* cannot overrule contrary holdings by the Texas Supreme Court. As discussed below, there are no contrary holdings by the Texas Supreme Court. In actuality, *Springer* is not an isolated decision and is consistent with the holdings of other courts, including the

---

[81] *Id.* at 282-83 (citations and footnote omitted) (emphasis added).
[82] *Id.* at 284 (citations omitted) (emphasis added).

Texas Supreme Court. For example, this Court quoted the following explanation by the Texas Supreme Court as to the nature of a mineral estate:

> While a mineral rights owner has a real interest in oil and gas in place, this right does not extend to *specific* oil and gas beneath the property; ownership must be considered in connection with the law of capture, which is recognized as a property right as well. **The minerals owner is entitled, not to the molecules actually residing below the surface, but to a fair chance to recover the oil and gas in or under his land, or their equivalents in kind.**[83]

30. Likewise, in *Humble Oil & Refining Co. v. West*, the Wests conveyed all of the subject lands to Humble "by fee simple conveyance" reserving only a royalty interest.[84] The Texas Supreme Court thus observed that Humble "owns the lands in fee simple, and this includes **not only the surface and mineral estates, but also the matrix of the underlying earth**, i.e., the reservoir storage space, subject only to the reserved right of the Wests to the payment of royalties on minerals that are produced and saved."[85] The same is not true of Lightning as it owns the Mineral Estate only.

31. In *Springer*, this Court also cited *Emeny v. United States*[86] and *Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*,[87] both of which provide guidance here. *Emeny* was cited with approval by the Texas Supreme Court in

---

[83] *Id.* at 283-84 (quoting *Coastal Oil & Gas Corp. v. Garza Energy Trust*, 268 S.W.3d 1, 15 (Tex. 2008)) (italics by Texas Supreme Court; all other emphasis added).
[84] 508 S.W.2d 812, 813 (Tex. 1974).
[85] *Id.* at 815 (emphasis added).
[86] 412 F.2d 1319 (Ct. Cl. 1969) (per curiam).
[87] 630 F.3d 411 (5th Cir. 2011).

*Humble v. West.*[88] It involved an attempt by a mineral lessee to inject and store helium it produced elsewhere beneath the surface of the property in question. It was held, however, that this right belonged to the surface owner because:

> The surface of the leased lands **and everything in such lands, except the oil and gas deposits covered by the leases, were still the property of the respective landowners. This included the geological structures beneath the surface**, including any such structure that might be suitable for the underground storage of "foreign" or "extraneous" gas produced elsewhere.[89]

32. Likewise, *Dunn-McCampbell* involved a dispute over mineral owners' rights of ingress and egress across the surface of the Padre Island National Seashore owned by the National Park Service. Anadarko quotes the Fifth Circuit's holding in favor of the National Park Service at some length because it is so pertinent:

> Although it is true that Dunn-McCampbell and others own mineral estates beneath the Seashore's surface, **the conveyance of mineral rights ownership does not convey the entirety of the subsurface**. As the Texas Supreme Court has stated, "[t]he minerals owner is entitled, not to the molecules actually residing below the surface, but to a fair chance to recover the oil and gas ...." *Coastal Oil & Gas Corp. v. Garza Energy Trust,* 268 S.W.3d 1, 15 (Tex.2008). In other words, **if there are no minerals** beneath the surface of the Seashore, Dunn-McCampbell owns the legal fiction of an **estate that is nothing**.
>
> Here, there was a conveyance of land to the Service. "[L]and includes the surface of the earth and everything over and under it, including

---

[88] *Springer,* 421 S.W.3d at 283.
[89] 412 F.2d at 1323 (citing *Gulf Prod. Co. v. Continental Oil Co.,* 132 S.W.2d 553, 561 (Tex. 1939)) (emphasis added).

minerals in place ..." *Averyt v. Grande Inc.*, 717 S.W.2d 891, 894 (Tex.1986). In this case, the minerals were not "in place" since they had been severed or were reserved. Although **"[t]here is a difference ... between the estate granted and the land described [in that] [l]and is the physical earth in its natural state, while an estate in land is a legal unit of ownership in the physical land[,]"** *see id.,* it unbearably strains credulity to suggest that a surface estate, conveyed in a deed describing the land in horizontal terms, only touches a millimeter of the surface, and excludes all other land below the surface. If, as here, the surface estate alone is conveyed, and a mineral reservation is made, the conveyance "vests in the grantee such rights to the use thereof as are usually exercised by owners in fee subject *only* to the right of the grantor to remove the minerals reserved." *Fleming Found. v. Texaco, Inc.*, 337 S.W.2d 846, 851 (Tex.Civ.App.1960) (emphasis added). As we have noted, **the mineral estate owner does not own the "molecules actually residing below the surface."** *Coastal Oil & Gas Corp.*, 268 S.W.3d at 15. It thus stands to reason that **the Service, not Dunn-McCampbell, owns all non-mineral "molecules" of the land, i.e., the mass that undergirds the surface of the National Seashore.**[90]

...

To summarize, **Dunn-McCampbell does not own the land below the Seashore's surface**, and, even if it did, the subsurface land would still be within the park's boundaries. **Texas law establishes that the holder of a mineral estate has the right to exploit minerals, but does not own the subsurface mass.**[91]

Lightning makes much of the fact that *Springer* recognizes the owner of a mineral estate has the right to exploit the minerals. That is true; Anadarko has said so all along. However, the foregoing cases, and those that follow, draw a definitive

---

[90] 630 F.3d at 441-42 (italics in original; all other emphasis added).
[91] *Id.* at 442 (emphasis added).

28

distinction between the right to exploit minerals and ownership of the subsurface mass.

33. Cases from multiple other jurisdictions are in accord with *Springer* and the other authorities briefed above.[92] In addition, an analogy exists in the law of other jurisdictions governing coal mining. For example, in *Oryn Treadway Sheffield, Jr., Trust v. Consolidation Coal Co.*, the court recognized that "[o]nce the coal is exhausted, the space it occupied reverts to the grantor by operation of law."[93] This analogy is instructive because it acknowledges the aforementioned distinction between a substance "in place" versus the "place" at which the substance may be found. This distinction has long existed under Texas law because, as alluded to above, minerals "are a part of the realty **while in place**;"[94] however, "[t]here can be no doubt that gas which has been produced is personal

---

[92] *See, e.g., Burlington Res. Oil & Gas Co., LP v. Lang & Sons Inc.*, 259 P.3d 766, 770 (Mont. 2011) (holding that "[t]he pore space beneath Lang's property belongs to Lang's surface estate in the same manner that all the non-mineral material beneath the physical boundaries of Lang's property belongs to Lang's surface estate"); *Department of Transp. v. Goike*, 560 N.W.2d 365, 366 (Mich. Ct. App. 1996) (concluding that "a surface owner possesses the right to the storage space created after the evacuation of underground minerals or gas"); *Pomposini v. T.W. Phillips Gas & Oil Co.*, 580 A.2d 776, 778-79 (Pa. Super. Ct. 1990) (holding that the mineral lessee "did not acquire an estate in the caverns" because "[t]he right to extract gas did not include the right to use the cavernous spaces owned by the lessor for the storage of gas in the absence of an express agreement").

[93] 819 F.Supp.2d 625, 629 (W.D. Va. 2011), *aff'd*, 497 Fed. Appx. 318 (4th Cir. 2012).

[94] *Natural Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 192 (Tex. 2003); *Texas Co. v. Daugherty*, 176 S.W. 717, 720 (Tex. 1915).

property."[95] This rule lends further credence to the view that the Mineral Estate carries rights to the **minerals**, not rights to the **location** at which they may be found beneath the surface.

34.     The view that the contours of the Mineral Estate are not delineated by reference to a physical location also comports with common sense and the practicalities of the real world. Any attempt to define the Surface Estate and the Mineral Estate such that one gives way to the other at a particular depth would create a conundrum. Would the Surface Estate yield to the Mineral Estate a foot below the ground? One hundred feet below the ground? One thousand feet? Deeper? Shallower? For this reason, the law does not define the Mineral Estate as reaching to any particular depth or stratum or as covering everything below the surface of the earth. If the owner of a mineral estate truly had the right to exclusively possess and occupy all spaces below the surface of the earth as Lightning suggests, then a surface owner would be prohibited from doing anything whatsoever at any depth below the surface, including such basic and common activities as drilling a water well, installing a fence post or utility pole, excavating to construct a lake or placing a basement beneath a building.

---

[95] *Lone Star Gas Co. v. Murchison*, 353 S.W.2d 870, 879 (Tex. Civ. App. – Dallas 1962, writ ref'd n.r.e.) (quoting 31-A TEX.JUR. 27 for the proposition that "[w]hen oil or gas is removed from the soil it becomes personalty").

35. While remaining essentially silent in response to this argument by Anadarko, Lightning has attempted to dismiss a portion of it on the basis that a groundwater well is part of the Surface Estate anyway. Lightning's observation is accurate. However, it misses the point and actually bolsters Anadarko's position that both the Surface Estate and the Mineral Estate are defined by the rights they encompass, not by the location or depth at which those rights are exercised. Absent interference with Lightning's Mineral Estate, the owner of the Surface Estate is at liberty to exercise its rights at any depth and in any subsurface strata it elects because "any mineral rights not severed from the original bundle of property rights continue to pass with, and remain unsevered from, the surface estate."[96] Therefore, the right to grant access to or exclude others from the subsurface mass underlying the Surface Estate belongs not to Lightning, but to Briscoe as the owner of the Surface Estate; thus, Lightning lacks standing to complain. This is a wise and pragmatic rule because it establishes a bright line. The rule Lightning urges would not; to the contrary, it would create confusion and uncertainty because it would become anyone's guess where the surface estate ends and the mineral estate begins in any given case. Anadarko's position should be confirmed because the law should create certainty rather than uncertainty whenever possible.[97]

---

[96] *Sutton v. Green*, No. 14-01-01043-CV, 2002 Tex. App. LEXIS 4983, at *8 (Tex. App. – Houston [14th Dist.] Jul. 11, 2002, no pet.) (citing *Birdwell v. Am. Bonding Co.*, 337 S.W.2d 120, 131 (Tex. App. – Fort Worth 1960, writ ref'd n.r.e.)).

[97] *See Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 510 (Tex. 1993) (noting the

36.     The cases Lightning cites involving surface trespasses are inapposite. Concepts regarding surface trespass do not squarely fit in cases involving mineral estates because a mineral estate is not and cannot be demarcated by reference to a place or a physical "boundary" and cannot be trespassed upon absent interference with the rights associated with the mineral estate.  As the Texas Supreme Court explained in *Railroad Comm'n of Texas v. Manziel*, "[t]he orthodox rules and principles applied by the courts as regards surface invasions of land may not be appropriately applied to subsurface invasions as arise out of the secondary recovery of natural resources [because] [i]f the intrusions of salt water are to be regarded as trespassory in character, then under common notions of surface invasions, the justifying public policy considerations behind secondary recovery operations could not be reached in considering the validity and reasonableness of such operations."[98]     Anadarko recognizes the present case does not involve secondary recovery operations or an injection well as *Manziel* did.  Regardless, *Manziel* confirms that traditional surface trespass principles do not fit in the subsurface context and that the public policy of promoting oil and gas development is highly relevant and should be upheld if possible.

---

court's objective is "to promote certainty and uniformity in the law"); *Greene v. Farmers Ins. Exch.*, 446 S.W.3d 761, 771 (Tex. 2014) (Boyd and Willett, JJ., concurring) (quoting Oliver Wendell Holmes, Jr., THE COMMON LAW 127 (1909), for the proposition that "the tendency of the law must always be to narrow the field of uncertainty").
[98] 361 S.W.2d 560, 568 (Tex. 1962).

37. The Texas Supreme Court employed similar logic in holding that subsurface fracking is not a trespass even if it encroaches onto someone else's lease:

> Had Coastal caused something like proppants to be deposited on the surface of Share 13, it would be liable for trespass, and from the ancient common law maxim that land ownership extends to the sky above and the earth's center below, one might extrapolate that the same rule should apply two miles below the surface. But that maxim – cujus est solum ejus est usque ad coelum et ad inferos – "has no place in the modern world." Wheeling an airplane across the surface of one's property without permission is a trespass; flying the plane through the airspace two miles above the property is not. Lord Coke, who pronounced the maxim, did not consider the possibility of airplanes. But neither did he imagine oil wells. The law of trespass need no more be the same two miles below the surface than two miles above.[99]

38. Notably, none of the cases Lightning relies upon involved horizontal wells such as those Anadarko proposes to drill, nor do they present facts in line with those of the present case. Although Lightning glosses over the distinction between surface and subsurface trespasses, this distinction is dispositive and is necessary to keep pace with technology and the real world.

39. Lightning's attempt to sidestep Anadarko's cases and to distinguish *Springer* on the basis that it did not involve a trespass claim is striking when one considers the subject matters of many of the authorities on which Lightning relies.

---

[99] *Coastal Oil & Gas Corp. v. Garza Energy Trust*, 268 S.W.3d 1, 11 (Tex. 2008); *see also id.* at 30 (Willett, J., concurring) (positing that "[b]alancing the respective interests as we did in *Manziel*, this type of subsurface encroachment, like the waterflood in *Manziel*, simply isn't wrongful and thus isn't a trespass at all, not just a nonactionable trespass").

For instance, Lightning suggests a case addressing two certified questions involving an organ donor in the insurance arena is somehow persuasive.[100] It is not. *Stephens County v. Mid-Kansas Oil & Gas Co.* is another certified question case relied on by Lightning, this one presenting the unrelated issue of "whether appellee acquired ... such interests or such estates in land as were subject to separate taxation."[101] *McAlister v. Eclipse Oil Co.*[102] dealt with the cancellation of stock. None of these cases have anything to do with the facts at bar.

40.     Lightning cites *Texas Co. v. Daugherty*[103] to try to suggest it somehow owns the subsurface strata despite this Court's holding in *Springer*. The issue in *Daugherty* was whether certain leases constituted property subject to taxation. No one questions that a mineral estate is a real property interest, that minerals are considered real property while in place and that they are thus subject to property taxes. *Daugherty* merely referenced "strata" to say minerals lie in them and are taxable as such. It sheds no light on the question at hand because it is silent on the issue of who actually owns the strata or subsurface space in which the minerals may be found. Lightning's suggestion that *Daugherty*'s holding in the taxation context somehow means Lightning owns the entirety of the subsurface mass for purposes of trespass law is wrong. Nothing in *Daugherty* suggests that the surface

---

[100] *See Evanston*, 370 S.W.3d 377.
[101] 254 S.W. 290, 291 (Tex. 1923).
[102] 98 S.W.2d 171 (Tex. 1936).
[103] 176 S.W. 717 (Tex. 1915).

owner's property tax liability was reduced because it did not own the space within the strata in which the minerals reside. For Lightning's reading of *Daugherty* to be correct, such a reduction would have had to occur. Thus, Lightning's interpretation does not comport with reality or common sense and conflicts with *Springer*, as well as all of the other authorities Anadarko cited above. Again, *Springer* makes clear the contours of the mineral and surface estates do not vary with the context.[104]

41.     Lightning also relies on *Marcus Cable Associates, L.P. v. Krohn*,[105] which was an easement case holding that a narrow grant of an easement for electrical lines does not authorize the grantee to expand its use to cable lines. *Marcus* had nothing to do with minerals and did not involve a claim of subsurface trespass, which is a peculiar type of claim to which "[t]he orthodox rules and principles applied by the courts as regards surface invasions of land may not be appropriately applied."[106]

42.     In sum, the types of cases relied upon by Lightning run the gamut; however, not one of them addresses a trespass claim such as the one alleged here, where the surface owner grants permission to a contiguous mineral owner to use its surface to extract minerals which the contiguous mineral owner has, without

---

[104] 421 S.W.3d at 284.
[105] 90 S.W.3d 697 (Tex. 2002).
[106] *Manziel*, 361 S.W.2d at 568.

question, the right to produce. Further, not one case relied on by Lightning addresses whether a mineral estate is a place or simply the right to obtain minerals from a place. In contrast, Anadarko cites to cases that are much more analogous and hold exactly that.

### ii. None of the rights associated with the Mineral Estate have been damaged or are in jeopardy of being damaged.

43. Anadarko is not aware of any Texas case finding a subsurface trespass on a mineral estate without a showing of damage to or drainage of the minerals, such as in the case of a well (unlike the wells Anadarko proposes) that is bottomed on and actually producing oil or gas from a mineral estate in which the defendant does not own an interest. This makes perfect sense because, as discussed above, the mineral owner does not possess the right to a space but instead possesses the right to extract minerals lying within that space. Lightning ignores this point and continues to rely on cases that are distinguishable from the instant one on that very basis. For example, in *Hastings Oil Co. v. Texas Co.*, injunctive relief was granted and a directional survey was ordered because, contrary to the facts at bar, it was alleged that the defendant's well would be deviated such that **it would bottom on and produce from lands owned by the plaintiff**.[107] Specifically, the injunction upheld in *Hastings* restrained production of oil "from a well admittedly begun on

---

[107] 234 S.W.2d 389, 389 (Tex. 1950).

36

defendant's surface but allegedly **completed in plaintiff's subsurface**."[108] Those facts stand in sharp contrast to those in this case, where the evidence shows Anadarko's wells will not be completed on Lightning's Mineral Estate, do not threaten to produce, destroy or remove minerals from the Mineral Estate and will not harm or subtract from the value of the Mineral Estate. Again, Lightning continues to cite *Hastings*, and even to include parentheticals recognizing it involved a well that "bottomed out in another's mineral estate,"[109] without addressing this key distinction.

44.     *Watkins v. Certain-Teed Products Corp.* is also instructive because the court expressed a similar sentiment in the context of adverse possession by recognizing that "a mere adverse possession and use of the surface does not constitute adverse possession of the minerals under the surface."[110]  To the contrary:

> [A]fter severance of the oil and gas estate adverse possession of the surface is not adverse possession of the minerals. When the adverse entry is made after the severance, something more than use of the surface is required.  Such dominion must be exercised over the minerals as will be notice to the owner of the mineral estate that **the possessor of the surface estate is claiming the minerals also**.[111]

45.     In sum, absent actual damage to the Mineral Estate or infringement of the bundle of rights it includes, no cause of action lies. Anadarko's proposed wells

---

[108] *Id.* at 397 (emphasis added).

[109] *See, e.g.*, Lightning's Brief, at 18.

[110] 213 S.W.2d 981, 984-85 (Tex. Civ. App. – Amarillo 1950, no writ).

[111] *Id.* at 985 (emphasis added).

would not exercise dominion over the minerals in Lightning's Mineral Estate. Thus, it is a misnomer to say that Anadarko will somehow "enter" (much less possess, use or damage) the Mineral Estate merely by passing its wellbores through, but not producing from, one or more subsurface strata in which minerals Lightning has a right to produce may be found. To do so would mean the mere presence of a pipe (*i.e.*, the wellbore) in some location or at some depth anywhere beneath the surface of the earth under which Lightning's minerals rest is a trespass. As shown, this is not – and cannot be – the law. To hold that it is would not only fly in the face of common sense, it would also thwart what "has long been public policy in Texas to promote development and protection of oil and gas."[112]

46.     Anadarko does not deny that if it actually interfered with Lightning's rights to develop, possess, use or enjoy its minerals, then *Hastings* might apply and a trespass could possibly be found. However, that has not occurred (because no drilling has yet to take place) and there is no evidence that it will occur. Even if there was a trespass, Lightning still would not be entitled to injunctive relief unless

---

[112] *See Brown v. Humble Oil & Ref. Co.*, 83 S.W.2d 935, 940-41 (Tex. 1935) (recognizing this policy as fundamental to the Railroad Commission's authority to promulgate rules, regulations and orders relating to the protection of oil and gas); *Coastal*, 268 S.W.3d at 15 (explaining that "the rule of capture makes it possible for the Commission, through rules governing the spacing, density, and allowables of wells, to protect correlative rights of owners with interests in the same mineral deposits while securing 'the state's goals of preventing waste and conserving natural resources'"); *Browning Oil Co., Inc. v. Luecke*, 38 S.W.3d 625, 646 (Tex. App. – Austin 2000, pet. denied) (observing that "[f]actors such as the prevention of waste, protection of the rights of landowners, and maximized recovery of minerals bear upon this area of law [involving the rule of capture as applied to horizontal wells] and necessarily affect the rights of the parties").

it showed loss of or injury to its minerals and that Anadarko was unable to respond in damages for the resulting injuries.[113] Because Lightning did not and could not make these requisite showings, the trial court properly refused to enter a temporary injunction and ultimately granted summary judgment for Anadarko on Lightning's request for injunctive relief.

47.     As shown, the summary judgment evidence demonstrates that Anadarko makes no claim to, and will not produce hydrocarbons from or in any way damage, Lightning's Mineral Estate.  It also demonstrates that Anadarko has permission from Briscoe to do what it proposes to do; thus, its actions are justified.[114]  Accordingly, summary judgment is in order because there is no trespass or tortious interference as a matter of law.  As detailed above, the only hint that Anadarko might possibly interfere with Lightning's Mineral Estate is a suggestion by Lightning's witnesses at the temporary injunction hearing that there could potentially be damage **if** a blowout were to occur and that the five wells Anadarko might drill from the surface location in question **could** cause Lightning difficulty in drilling a potential "protection well" that is "on the drawing board."[115]

---

[113] TEX. CIV. PRAC. & REM. CODE § 65.012(a); Appendix A.

[114] *Prudential Ins. Co. of Am. v. Financial Review Servs., Inc.*, 29 S.W.3d 74, 80 (Tex. 2000) (observing that the justification defense to a tortious interference claim presents a question of law and "can be based on the exercise of either (1) one's own legal rights or (2) a good-faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken").

[115] CR 505, at ll. 6-22; CR 508, at ll. 6-14; CR 509, at ll. 1-2.

Again, however, those same witnesses conceded that any such risk is only a "possibility, not a probability"[116] and is miniscule at best.[117]

48.    The suppositions Lightning's witnesses offered were inadequate to establish probable, imminent and irreparable injury as necessary for Lightning to obtain injunctive relief. They also constitute no evidence of damage as a matter of law. This is so for at least two reasons. First, "[t]here can be no recovery for damages which are speculative or conjectural. The damages must be ascertainable in some manner other than by mere speculation or conjecture, and by reference to some fairly definite standard, established experience, or direct inference from known facts."[118] Speculative testimony about what might occur if something were to happen at some unknown future time does not pass this test. Second, the testimony of Lightning's witnesses confirms no damage has occurred at this juncture; thus, any claim for damages is not ripe as it is premature at best.[119] This is another reason Lightning lacks standing.

---

[116] Temporary Injunction Transcript, at p. 99, ll. 2-7.

[117] Temporary Injunction Transcript, at p. 132, ll. 13-19; Temporary Injunction Transcript, at p. 142, ll. 3-13.

[118] *A.B.F. Freight Sys., Inc. v. Austrian Import Serv., Inc.*, 798 S.W.2d 606, 615 (Tex. App. – Dallas 1990, writ denied) (citing *Roberts v. U.S. Home Corp.*, 694 S.W.2d 129, 135 (Tex. App. – San Antonio 1985, no writ), and *Berry Contracting, Inc. v. Coastal States Petrochemical Co.*, 635 S.W.2d 759, 761 (Tex. App. – Corpus Christi 1982, writ ref'd n.r.e.)); *Texas Pipe Line Co. v. Hildreth*, 225 S.W. 583, 584-85 (Tex. Civ. App. – Fort Worth 1920, no writ).

[119] *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 852 (Tex. 2000) (holding "[a] case is not ripe when determining whether the plaintiff has a concrete injury depends on contingent or hypothetical facts, or upon events that have not yet come to pass").

49. Lightning writes that it "has met its obligations under [the Cutlass Lease] and intends to continue to do so provided that Anadarko does not trespass ... or interfere with Lightning's development of its mineral estate."[120] Again, there will be no trespass or interference. Regardless, it appears Lightning believes its fulfillment of its lease obligations somehow entitles it to prevent Anadarko from exercising its rights under the Chaparral Wildlife Management Area Lease and under its surface use agreement with Briscoe. If that is Lightning's belief, it is both incorrect and a non-sequitur as Lightning's obligations remain the same irrespective of Anadarko's surface location. For example, Anadarko recognizes that Lightning has offset obligations; however, these obligations are not dependent on Anadarko's surface location. Thus, Anadarko's planned wells should (and based on the summary judgment evidence will) have no effect on Lightning's obligations or its ability to meet the same. Moreover, Anadarko has shown it will accommodate Lightning if and as reasonably necessary in keeping with industry standards.[121] In short, Lightning can drill the wells it is obligated to drill irrespective of Anadarko's activities.

50. Lightning advances cases involving geophysical data, claiming Anadarko will commit a trespass because it will obtain core and log data concerning the Mineral Estate that is proprietary to Lightning. In each of those

---

[120] Lightning's Brief, at 3.
[121] CR 740.

41

cases, the sole purpose of the defendant's conduct was to obtain information about the plaintiff's mineral estate for its own use; thus, the conduct was unlawful from the get-go. For example, Lightning relies on the *Cowden* cases involving trespass on a mineral estate by way of a reflection seismograph survey.[122] However, *Cowden* did not involve injunctive relief. In addition, the owner of the mineral estate in *Cowden* proved damage.[123] That is not the situation here.[124]

51. The summary judgment evidence establishes Anadarko will perforate its wellbores for production only under its own Chaparral Wildlife Management Area Lease and will conduct only minimal, necessary testing designed in part to ensure it will not perforate its wells within Lightning's Mineral Estate.[125] None of the information Anadarko obtains will benefit it beyond its drilling of the wells in question exclusively in its own mineral estate.[126] As discussed, the Texas Supreme Court has expressly held that subsurface fracking, even when suspected or known to go onto and penetrate another's lease, is not a trespass.[127] Thus, the rule of capture is alive and well in Texas so long as field rules are honored. Lightning does not and cannot suggest, and there is no summary judgment evidence, that

---

[122] *Phillips Petroleum Co. v. Cowden*, 241 F.2d 586 (5th Cir. 1957); *Phillips Petroleum Co. v. Cowden*, 256 F.2d 408 (5th Cir. 1958).

[123] 241 F.2d at 593; 256 F.2d at 409 (holding "the evidence was sufficient to sustain the trial court's finding that appellants had trespassed and that the damages per acre amounted to $20.00").

[124] CR 740-43.

[125] CR 299, 740-41.

[126] *Id.*

[127] *Coastal*, 268 S.W.3d at 13, 17.

Anadarko has violated or will violate any field rules. To the contrary, the summary judgment evidence confirms Anadarko intends to comply with all field rules.[128] In the event it fails to do so, Anadarko will be subject to penalties and there will be remedies available to Lightning.

52.     As long as Anadarko perforates and fracture stimulates the Eagle Ford formation in a lawful location under the Chaparral Wildlife Management Area Lease, Lightning has no legal basis to grouse about the same. The Texas Supreme Court has long recognized that the Railroad Commission's authority to promulgate rules, regulations and orders relating to the protection of oil and gas is intended to promote the public policy of oil and gas production.[129] Stated succinctly, the fact that unproductive portions of Anadarko's wellbores will traverse under the Cutlass Lease on the way to producing Anadarko's adjacent mineral estate is not the equivalent of a trespass.

53.     Lightning cites this Court's opinion in *Villarreal v. Grant Geophysical, Inc.* for the proposition that "trespass under Texas law includes subsurface trespass as in the oil and gas context."[130] Anadarko does not dispute that statement; however, as shown by *Springer* and the other authorities cited

---

[128] CR 299, 302.

[129] *See Brown*, 83 S.W.2d at 940-41; *Coastal*, 268 S.W.3d at 15 (explaining that "the rule of capture makes it possible for the Commission, through rules governing the spacing, density and allowables of wells to protect correlative rights of owners with interest in the same mineral deposits while securing 'the state's goal of preventing waste and conserving natural resources'").

[130] 136 S.W.3d 265, 268 (Tex. App. – San Antonio 2004, pet. denied); Lightning's Brief, at 12.

above, trespass law must apply differently beneath the surface than it does on the surface. In *Villarreal*, the defendants received permission to shoot three-dimensional seismic on various tracts all around the mineral estate owned by the Villarreals, who did not consent to the defendants' seismic activities. The defendants claimed it was unavoidable to obtain data from the Villarreals' mineral estate. This Court found no trespass occurred and that the defendants "did not wrongfully secure a benefit nor did they passively receive one which would be unconscionable to retain."[131] Thus, *Villarreal* confirms that a plaintiff has no claim when data is obtained without a trespass. Here, the evidence confirms that when the wells are drilled there will be no trespass because Anadarko is authorized to conduct all planned activities; thus, even if Lightning experienced some consequential indirect impact, that would not make the planned actions improper.[132] That is particularly true where, as here, there is no damage.

54. Likewise, Lightning relies upon *FPL Farming, Ltd. v. Environmental Processing Systems, L.C.*[133] for its assertion that a subsurface trespass is actionable.

---

[131] *Id.* at 270.

[132] *See, e.g.*, Restatement (Second) of Torts § 822 cmt. G (1997); *Goose Creek Ice Co. v. Wood*, 223 S.W. 324, 328-29 (Tex. Civ. App. – Galveston 1920, no writ) (holding one is not entitled to relief against apprehension of injury or "mere prospect of future annoyance ... [s]o the erection of a building for a lawful purpose will not be restrained"); *see id.* ("To authorize an injunction preventing the use by the owner of the property for any lawful purpose, or in the carrying on of any lawful purpose, it must be shown that such use will materially injure or damage the person complaining of such use. This is especially true in regard to business enterprises in which the public are interested or derive a benefit.")

[133] 351 S.W.3d 306 (Tex. 2011); Lightning's Brief, at 34-35.

This is another example of Lightning reciting black-letter law that is undisputed by Anadarko, but which does not apply. In *FPL*, it was alleged that wastewater injected into the defendant's deep wastewater injection wells physically migrated onto the plaintiff's property and contaminated its water supply.[134] The sole issue in *FPL* was whether the defendant was absolved of tort liability simply because it had obtained regulatory permits to drill its wells. The court held it was not.[135] Regardless, Anadarko asserts no such defense. Moreover, the *FPL* court expressly noted that "[w]e do not decide today whether subsurface wastewater migration can constitute a trespass, or whether it did so in this case."[136] Thus, Lightning's assertion that *FPL* involved a "subsurface trespasser" is at best hyperbole because the court made no such determination. Regardless, *FPL* is of no value here because there is and has been no trespass. Accordingly, summary judgment for Anadarko was proper.

## B.    *Lightning's consent is not necessary.*

55.    Briscoe, as the owner of the Surface Estate, expressly consented to Anadarko's proposed activities; thus, Lightning's consent is not necessary. Moreover, the existence of Anadarko's surface use agreement with Briscoe confirms Anadarko's activities are justified and/or excused such that there is no

---

[134] *Id.* at 307.
[135] *Id.* at 314.
[136] *Id.* at 314-15.

tortious interference or trespass. Lightning writes that the surface owner "cannot unilaterally permit a third party to drill an oil-and-gas wellbore through a severed mineral estate regardless of where it bottoms out."[137] It cites no authority for that proposition because there is none. In fact, *Humble Oil & Refining Co. v. L & G Oil Co.*[138] is on point and confirms the contrary is true. Lightning attempts to distinguish *Humble* because it did not involve a trespass claim; however, it did involve a request for injunctive relief. Moreover, it articulated a rationale that squarely fits this case.

56. In *Humble*, Magee and Massad obtained permits to drill wells on their leaseholds underlying a railroad right-of-way but were unable to secure permission from the railroad to drill from the surface of the right-of-way.[139] Magee and Massad acquired the right to drill from the surface of an adjacent one-acre parcel. Humble owned the mineral estate underlying the one-acre parcel.[140] Much like Anadarko here, Magee and Massad sought to drill directionally through a portion of Humble's mineral estate and bottom their wells within their own mineral estates. The court refused to enjoin Magee and Massad from doing so, reasoning that (a) the bottom hole locations of Magee's and Massad's wells were in their own mineral estates and would not extract hydrocarbons directly from Humble's

---

[137] Lightning's Brief, at 25.
[138] 259 S.W.2d 933 (Tex. Civ. App. – Austin 1953, writ ref'd n.r.e.).
[139] *Id.* at 934.
[140] *Id.* at 934-35.

46

mineral estate,[141] (b) Humble's mere suggestion that it may want to drill from the surface location occupied by Magee and Massad at some point in the future was insufficient to show interference with its mineral rights[142] and (c) Magee and Massad obtained the right to enter the subject surface estate. Finding no evidence of interference with Humble's mineral rights, the court held the surface owner's valid exercise of its rights trumped those of the mineral owner and denied injunctive relief. This holding confirms that even when the mineral estate has been severed, the surface estate extends to the center of the earth.

57.     Each of the factors relied on in *Humble* exists in the case at bar. First, Lightning failed to show that Anadarko's surface well locations or proposed drilling activities will interfere with its mineral rights at all, conceding its current planned well will not be impacted.[143] Second, Lightning merely muses it may want to drill, at some future time, from the location Briscoe permitted Anadarko to use as a drill site, which *Humble* confirms is insufficient. Finally, Anadarko stands in much the same position Magee and Massad did in *Humble* because it: (a) has been unable to reach an agreement to develop its leasehold from the surface directly above it (and in fact must develop from offsite locations "when prudent

---

[141] *Id.*

[142] *Id.*

[143] Temporary Injunction Transcript, at p. 90, l. 8 through p. 91, l. 4; Temporary Injunction Transcript, at p. 92, ll. 8-17.

and feasible");[144] (b) lawfully obtained express permission from Briscoe as the owner of the Surface Estate adjacent to Anadarko's mineral estate to enter and conduct drilling operations from designated locations on the Surface Estate; and (c) will perforate and produce its well(s) solely from within its own mineral estate. These factors not only support the trial court's denial of Lightning's motion for summary judgment and its granting of Anadarko's, they also confirm Anadarko needed only to obtain the consent of the owner of the Surface Estate to do that which it proposes to do.

58.    Commentators support the reasoning of *Humble* and conclude that, absent a showing of interference, a subsurface trespass should not be found if an operator like Anadarko secures permission from a surface owner to drill directionally from the surface site to develop minerals on adjacent land.   As observed by one such commentator, "permission from (mineral) Lessee Y seems to be necessary only if the drilling of the well interferes with Y's right to produce the minerals from Tract A."[145]   Using the following hypothetical that is virtually identical to the present case, another commentator urges that permission from the

---

[144] CR 301-02, 309; Temporary Injunction Transcript, at p. 85, ll. 11-14.
[145] *See* H. Philip Whitworth & Davin McGinnis, *Square Pegs, Round Holes: The Application and Evolution of Traditional Legal and Regulatory Concepts for Horizontal Wells*, 7 TEX. J. OIL, GAS & ENERGY LAW 177, 201 (2011/2012); *see also* Owen L. Anderson, *Lord Coke, the Restatement, and Modern Subsurface Trespass Law*, 6 TEX. J. OIL, GAS & ENERGY LAW 203, 206 (2011).

surface owner to enter the land is sufficient to prohibit an actionable subsurface

trespass claim, absent any actual damage to the subsurface owner:

> Suppose that an operator who holds the right to develop Tract B
> locates a well on the surface of Tract A and uses the surface and
> subsurface of Tract A to gain access to the Tract B hydrocarbons.
> Further suppose that the Tract A surface owner gave the operator
> permission to use both the surface and subsurface of Tract A for this
> purpose but that the mineral (hydrocarbon) owner of Tract A did not
> give permission. Further, suppose that the surface of Tract B will not
> readily accommodate an efficient well location that all well
> perforations comply with conservation regulations and are limited to
> Tract B.[146]

The treatise goes on to note that as a practical matter, subsurface owners would

seldom, if ever, consent for another to enter the surface for the purpose of drilling

to an adjacent land because subsurface owners have "a natural incentive to deny

access due to the drainage they might suffer."[147] This concern is addressed by

compliance with regulatory restrictions and the rule of capture, which assure

everyone a fair opportunity to produce their minerals. This is another reason the

mineral estate owner's consent is not required.

59.     Lightning points to *Chevron Oil Co. v. Howell*[148] in an effort to avoid

*Humble*. Setting aside the fact *Chevron* has never been cited by a court, it fails to

support Lightning's argument and is not "almost identical" to this case as

---

[146] Owen L. Anderson, *Subsurface "Trespass": A Man's Subsurface Is Not His Castle*, 49 WASHBURN L.J. 247, 263 (2010).
[147] *Id.*
[148] 407 S.W.2d 525 (Tex. Civ. App. – Dallas 1966, writ ref'd n.r.e.).

Lightning contends.[149] Lightning tells this Court that *Chevron* holds "both the mineral-estate owner and the surface-estate owner must give permission" in circumstances such as exist here.[150] In actuality, *Chevron* holds no such thing. It simply recites that neither the mineral nor surface estate owner in question gave permission, not that both must give permission. A more accurate summary of the facts of that case follows.

60.     In *Chevron*, the defendant attempted to drill from a surface location adjacent to its mineral estate without obtaining permission to enter from the surface lessee. Instead, the surface lessee expressly opposed the use of his surface and was one of the parties seeking injunctive relief to prevent the surface operations on his land. Thus, a surface trespass was occurring; that is not so here because Anadarko has express permission from Briscoe to enter upon and make use of the Surface Estate. That a surface trespass occurred appears to be the primary, if not the sole, basis on which the *Chevron* court granted injunctive relief. Moreover, unlike the present case where Lightning's own witnesses conceded that Anadarko's proposed wells would not cause any interference, there was evidence in *Chevron* of damage to the mineral estate and interference with the surface lessee's existing uses.[151] These distinctions are crucial because they go to the heart

---

[149] Lightning's Brief, at 19.
[150] Lightning's Brief, at 20.
[151] 407 S.W.2d at 528.

of Anadarko's position that the law requires only the consent of the owner of the Surface Estate and that the owner of the Mineral Estate has no claim absent actual damage to a right it truly possesses.

61.    In another effort to minimize the impact of Anadarko's surface use agreement with Briscoe, Lightning points out the agreement contains an indemnity provision which it says confirms "Briscoe knew full well that the activity Anadarko proposed was unrelated to its operation of the surface estate."[152] This is raw speculation.  Equally important, there is no summary judgment evidence of this or any other particular motive behind the indemnity provision, nor is there any evidence to suggest that the provision was anything other than what is commonly included in surface use agreements.  To the contrary, at most it may indicate that Briscoe does not want to have to deal with frivolous claims like Lightning asserts. What is undeniably clear is that Briscoe's belief as to the legal effect of the indemnity provision, if any such evidence of Briscoe's belief was in the record (which it is not), is irrelevant because that is a question of law for this Court to decide.[153]  Interpreting the surface use agreement under existing principles of law can result in but one conclusion, that it lawfully grants Anadarko the rights to use Briscoe's Surface Estate and to drill below the Surface Estate in order to reach the

---

[152] Lightning's Brief, at 27.
[153] *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011).

51

Chaparral Wildlife Management Area Lease. Accordingly, the Order granting summary judgment for Anadarko should be affirmed.

### C.   Additionally and/or alternatively, Anadarko is entitled to a no-evidence summary judgment.

62.   Rule 166a(i) of the Texas Rules of Civil Procedure provides that a court "must grant" a no-evidence motion for summary judgment unless the respondent produces summary judgment evidence raising a genuine issue of material fact as to each challenged element on which the respondent has the burden of proof at trial.[154] Lightning correctly recites that the parties agreed to submit the "central legal issues" by way of cross-motions for summary judgment and that they agree whether a subsurface trespass occurred or will occur is a question of law.[155] Thus, it is a mystery how Lightning now argues in its brief that fact issues exist. They do not.

63.   It is also curious how Lightning purports to know that "[t]he judge did not grant a no-evidence summary judgment."[156] As written above, the trial court entered the Order granting summary judgment for Anadarko without specifying the grounds on which it did so; thus, the Order must be affirmed on appeal "if any of the theories advanced are meritorious."[157]

---

[154] TEX. R. CIV. P. 166a(i); Appendix B.
[155] Lightning's Brief, at 45.
[156] Lightning's Brief, at 44.
[157] *Dow Chemical*, 46 S.W.3d at 242.

### i. Trespass

64. To recover damages for trespass to real property, a plaintiff must prove (a) ownership or lawful right to possess real property, (b) the defendant made a physical, intentional and voluntary entry onto plaintiff's land and (c) defendant's trespass caused injury to the plaintiff.[158] In the context of this case, "[t]he gist of an action of trespass is the injury to the right of **possession**."[159] Lightning produced no evidence, nor could it, that Anadarko has physically, intentionally and/or voluntarily "entered" the Mineral Estate or that it will do so. As shown, the Mineral Estate is not a place but is a bundle of rights; thus, it is impossible for Anadarko to "enter" the Mineral Estate unless it actually infringes on one or more of those rights. There is no evidence that anything Anadarko has done or will do in connection with its proposed drilling and development activities has injured, or will injure, Lightning's right to possess the Mineral Estate or its right or ability to produce minerals therefrom. Likewise, there is no evidence that Anadarko lacks authority to conduct its proposed activities or that Lightning has standing to complain about those activities. To the contrary, Anadarko entered into a surface use agreement with Briscoe authorizing that which it proposes to do. In sum, there is no evidence of a single element required to prove a trespass claim.

---

[158] *Prize Energy Res., L.P. v. Cliff Hoskins, Inc.*, 345 S.W.3d 537, 557 (Tex. App. – San Antonio 2011, no pet.) (citing *Wilen v. Falkenstein*, 191 S.W.3d 791, 798 (Tex. App. – Fort Worth 2006, pet. denied)).
[159] *Maranatha*, 833 S.W.2d at 739 (emphasis in original).

### ii. Tortious Interference

65.     The elements of a cause of action for tortious interference with an existing contract are (a) a contract subject to interference exists, (b) the alleged act of interference was willful and intentional, (c) the willful and intentional act proximately caused damage and (d) actual damage or loss occurred.[160] There is no evidence that any act by Anadarko proximately caused or will cause damage or that actual damage or loss has occurred or will occur. Likewise, there is no evidence that Anadarko's activities will interfere with any of Lightning's rights in the Mineral Estate, including the rights of "exploring, drilling, mining, operating for, producing, and owning those hydrocarbons" as alleged by Lightning. There is no evidence that Anadarko will obtain sensitive geophysical data pertaining to the Mineral Estate or that, if it does, Lightning will be damaged.

66.     In addition, Anadarko's actions are justified if they are done in the exercise of (a) Anadarko's own legal rights or (b) a good-faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken.[161] In light of Anadarko's surface use agreement with Briscoe, there is and can be no evidence that Anadarko has done or will do anything other than exercise its own legal rights or that it has acted or will act under a good-faith claim to a colorable legal right. Thus, there is no evidence that its actions are not justified.

---

[160] *ACS Investors v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997).
[161] *Prudential*, 29 S.W.3d at 80.

54

### iii.    Injunctive relief

67.    Injunctive relief is improper under the present facts, as both the trial court and this Court already have held. Lightning's request for injunctive relief is a remedy, not a cause of action.[162] In order to show it is entitled to the extraordinary remedy of injunctive relief, Lightning was required to plead and prove (a) a valid cause of action against Anadarko, (b) a probable right of recovery and (c) a probable, imminent and irreparable injury in the interim.[163] Moreover, Lightning must have shown "loss of or injury to [its] minerals" and an inability by Anadarko "to respond in damages."[164] Lightning failed to produce evidence to satisfy any of these elements.

68.    First, as shown above, Lightning did not and cannot establish a valid cause of action or a probable right of recovery for subsurface trespass under Texas law because no actionable trespass has occurred or will occur under Anadarko's proposed five-well drilling plan. Second, Lightning proved no damage or injury, much less any damage that is probable or imminent. It also failed to show irreparable injury. Irreparable injury exists only "if the injured party cannot be

---

[162] *Texas Dep't of State Health Servs. v. Balquinta*, 429 S.W.3d 726, 748 (Tex. App. – Austin 2014, pet. dism'd) (citing *Etan Indus., Inc. v. Lehmann*, 359 S.W.3d 620, 625 n.2 (Tex. 2011) (explaining that permanent injunctive relief is not itself a cause of action, but a remedy "available only if liability is established under a cause of action" (citing *Valenzuela v. Aquino*, 853 S.W.2d 512, 514 n.2 (Tex. 1993)).

[163] *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002); *Sun Oil Co. v. Whitaker*, 424 S.W.2d 216, 218 (Tex. 1968).

[164] TEX. CIV. PRAC. & REM. CODE § 65.012(a); Appendix A.

adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard."[165] Any injury to the Mineral Estate, were an injury to occur, would be compensable in damages. Lightning admitted as much at the temporary injunction hearing.[166] It also admitted in its brief that it believes it can quantify damages.[167] Again, there are no damages for all of the reasons explained; however, Lightning's admission that any damages can be monetized defeats its request for injunctive relief. Because there is no evidence to the contrary, the trial court correctly granted summary judgment for Anadarko.

## PRAYER

WHEREFORE, Anadarko requests that this Court affirm the Order and grant Anadarko such other and further relief to which it may be justly entitled.

---

[165] *Butnaru*, 84 S.W.3d at 204.

[166] Temporary Injunction Transcript, at p. 99, ll. 8-22; Temporary Injunction Transcript, at p. 137, l. 17 through p. 138, l. 2 (averring that the well currently planned by Lightning will not be interfered with by any of Anadarko's wells planned from the drill site in question).

[167] Lightning's Brief, at 50.

Respectfully submitted,

/s/ *David A. Palmer*

**Shayne D. Moses**
State Bar No. 14578980
smoses@mph-law.com
**David A. Palmer**
State Bar No. 00794416
dpalmer@mph-law.com
**Timothy D. Howell**
State Bar No. 24002315
thowell@mph-law.com
**MOSES, PALMER & HOWELL, L.L.P.**
309 W. 7th Street, Suite 815
Fort Worth, Texas 76102
817/255-9100
817/255-9199 (Fax)

**Donato D. Ramos**
State Bar No. 16508000
dondramos@yahoo.com
**Donato D. Ramos, Jr.**
State Bar No. 24041744
donatoramosjr@ddrlex.com
**LAW OFFICES OF DONATO D. RAMOS, LLP**
6721 McPherson Road
P.O. Box 452009
Laredo, Texas 78045
956/722-9909
956/727-5885 (Fax)

**ATTORNEYS FOR APPELLEE**

## CERTIFICATE OF COMPLIANCE WITH WORD LIMIT

Pursuant to Rule 9.4(i)(3) of the Texas Rules of Appellate Procedure, Anadarko certifies that the total number of words in this document, excluding the portions that may be excluded pursuant to Rule 9.4(i)(1), is 13,374.

*/s/ David A. Palmer*
**David A. Palmer**

## CERTIFICATE OF SERVICE

On April 1, 2015, a true and correct copy of this brief was served on the following counsel of record by electronic service and by certified mail, return receipt requested:

Bruce K. Spindler
Robinson C. Ramsey
John W. Petry
Stephen J. Ahl
LANGLEY & BANACK, INC.
Trinity Plaza II, Suite 900
745 East Mulberry Avenue
San Antonio, Texas 78212

*/s/ David A. Palmer*
**David A. Palmer**

# APPENDIX

A    &ndash;    TEX. CIV. PRAC. & REM. CODE § 65.012

B    &ndash;    TEX. R. CIV. P. 166a(i)

l:\anadarko\lightning oil\pleadings\appellate\appellee's brief - appeal of sj (final).doc

*Texas Statutes and Codes*  >  *CIVIL PRACTICE AND REMEDIES CODE*  >  *TITLE 3. EXTRAORDINARY REMEDIES*  >  *CHAPTER 65. INJUNCTION*  >  *SUBCHAPTER B. AVAILABILITY OF REMEDY*

# § 65.012. Operation of Well or Mine

(a) A court may issue an injunction or temporary restraining order prohibiting subsurface drilling or mining operations only if an adjacent landowner filing an application claims that a wrongful act caused injury to his surface or improvements or loss of or injury to his minerals and if the party against whom the injunction is sought is unable to respond in damages for the resulting injuries.

(b) To secure the payment of any injuries that may be sustained by the complainant as a result of subsurface drilling or mining operations, the party against whom an injunction is sought under this section shall enter into a good and sufficient bond in an amount fixed by the court hearing the application.

(c) The court may appoint a trustee or receiver instead of requiring a bond if the court considers it necessary to protect the interests involved in litigation concerning an injunction under this section. The trustee or receiver has the powers prescribed by the court and shall take charge of and hold the minerals produced from the drilling or mining operation or the proceeds from the disposition of those minerals, subject to the final disposition of the litigation.

# History

Enacted by Acts 1985, 69th Leg., ch. 959 (S.B. 797), § 1, effective September 1, 1985.

LexisNexis ® Texas Annotated Statutes

Copyright © 2015 by Matthew Bender & Company, Inc. a member of the LexisNexis Group All rights reserved.

DAVID PALMER

**Appendix A**

# Tex. R. Civ. P. 166a

This document is current through February 4, 2015

## Rule 166a Summary Judgment

(a) *For Claimant.* --A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the adverse party has appeared or answered, move with or without supporting affidavits for a summary judgment in his favor upon all or any part thereof. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to amount of damages.

(b) *For Defending Party.* --A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in his favor as to all or any part thereof.

(c) *Motion and Proceedings Thereon.* --The motion for summary judgment shall state the specific grounds therefor. Except on leave of court, with notice to opposing counsel, the motion and any supporting affidavits shall be filed and served at least twenty-one days before the time specified for hearing. Except on leave of court, the adverse party, not later than seven days prior to the day of hearing may file and serve opposing affidavits or other written response. No oral testimony shall be received at the hearing. The judgment sought shall be rendered forthwith if (i) the deposition transcripts, interrogatory answers, and other discovery responses referenced or set forth in the motion or response, and (ii) the pleadings, admissions, affidavits, stipulations of the parties, and authenticated or certified public records, if any, on file at the time of the hearing, or filed thereafter and before judgment with permission of the court, show that, except as to the amount of damages, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion or in an answer or any other response. Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal. A summary judgment may be based on uncontroverted testimonial evidence of an interested witness, or of an expert witness as to subject matter concerning which the trier of fact must be guided solely by the opinion testimony of experts, if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted.

(d) *Appendices, References and Other Use of Discovery Not Otherwise on File.* --Discovery products not on file with the clerk may be used as summary judgment evidence if copies of the material, appendices containing the evidence, or a notice containing specific references to the discovery or specific references to other instruments, are filed and served on all parties together with a statement of intent to use the specified discovery as summary judgment proofs: (i) at least twenty-one days before the hearing if such proofs are to be used to support the summary judgment; or (ii) at least seven days before the hearing if such proofs are to be used to oppose the summary judgment.

(e) *Case Not Fully Adjudicated on Motion.* --If summary judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the judge may at the hearing examine the pleadings and the evidence on file, interrogate counsel, ascertain what material fact issues exist and make an order specifying the facts that are established as a matter of law, and directing such further proceedings in the action as are just.

(f) *Form of Affidavits; Further Testimony.* --Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions or by further affidavits. Defects in the form of affidavits or attachments will not be grounds for reversal unless specifically pointed out by objection by an opposing party with opportunity, but refusal, to amend.

DAVID PALMER

**Appendix B**

**(g)** *When Affidavits Are Unavailable.* --Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

**(h)** *Affidavits Made in Bad Faith.* --Should it appear to the satisfaction of the court at any time that any of the affidavits presented pursuant to this rule are presented in bad faith or solely for the purpose of delay, the court shall forthwith order the party employing them to pay to the other party the amount of the reasonable expenses which the filing of the affidavits caused him to incur, including reasonable attorney's fees, and any offending party or attorney may be adjudged guilty of contempt.

**(i)** *No-Evidence Motion.* --After adequate time for discovery, a party without presenting summary judgment evidence may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. The motion must state the elements as to which there is no evidence. The court must grant the motion unless the respondent produces summary judgment evidence raising a genuine issue of material fact.

Texas Rules

Copyright © 2015 by Matthew Bender & Company, Inc. a member of the LexisNexis Group. All rights reserved.

DAVID PALMER